[Civ. No. 14123.   First Dist., Div. One.   Jan. 27, 1950.]

FRANK R. SULLIVAN, JR., Respondent, v. CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Dion R. Holm, City Attorney, Edmond P. Bergerot and George E. Baglin, Deputy City Attorneys, for Appellant.

Melvin M. Belli for Respondent.

PETERS, P. J.—Plaintiff brought this action against the city and county of San Francisco and various Does for injuries received by him while riding on a city streetcar. The jury

returned a verdict of $125,000. From the judgment entered on that verdict the city appeals.

The accident occurred on August 11, 1947. On June 20, 1947, plaintiff had been sworn in as a temporary noncivil service fireman. Such employees are issued a badge and a rule book, but are not required to purchase a regular uniform. They work in dark trousers and a dark shirt. About three weeks before the accident plaintiff was assigned to Engine No. 14, located at McAllister and Webster Streets, his daily shift starting at 6 p. m. On the day in question he decided to go to work rather early, and for this purpose took a Geary streetcar, paid his fare, and secured a transfer. At Geary and Fillmore he boarded a No. 22 car going south on Fillmore, presenting his transfer to the conductor. This streetcar was one of the oldest in the city's service, and was burned after the accident rather than repair it. The car was crowded, and plaintiff remained on the rear platform together with four or five other passengers. The streetcar had folding doors on the exit side of the rear platform. Plaintiff testified that at all times prior to the accident he was holding on, with both hands, to the rail around the control box located at the extreme rear of the car. The accident happened between Eddy and Turk Streets. There, one Wilkinson had parked a truck in such a way that its rear end was close to the streetcar tracks. When the streetcar approached the truck, the motorman, being doubtful as to whether the streetcar would clear the truck, stopped, and both he and the conductor looked to see if there was sufficient clearance between the streetcar and the stationary unoccupied truck. The conductor signalled the motorman to proceed, which he did, at a slow rate of speed. When the streetcar was about halfway past the truck the motorman again stopped. He did not then look at the truck and streetcar, but the conductor did. The conductor gave the signal to proceed, and the motorman went ahead. When the rear doors of the streetcar were opposite the edge of the parked truck they came into contact with the truck, resulting in the doors being thrown open and in plaintiff being thrown from the platform. He was caught between the truck and the streetcar and received the very serious injuries hereafter described.

While still in the hospital as a result of his injuries, plaintiff filed a claim against the city for $50,000, which was rejected. The original complaint named the city as the sole defendant and asked for $50,000 damages. By amendments, the driver

and owners of the truck were brought in as defendants, and, with court permission, the prayer was amended to ask for $150,000 damages.

The city, in addition to denying its own negligence, admitted the negligence of Wilkinson in parking the truck, and alleged, as a separate defense, that the accident was solely and proximately caused by the negligence of the driver and owners of the truck. The city also pleaded, as a special defense, that, at the time of the accident, plaintiff was a city employee on his way to work on transportation furnished by his employer as an incident of the employment; that, under such circumstances, the injury arose out of and in the course of the employment; that plaintiff's exclusive remedy against the city was under the Workmen's Compensation Act and not in the superior court. By an amendment to its answer, the city also set up the special defense that the plaintiff was limited to a recovery not to exceed $50,000 because that was the amount of the claim filed by plaintiff.

The case proceeded to trial. At the conclusion of plaintiff's case, the driver and the owners of the truck moved for a nonsuit. The motion was unopposed by plaintiff or by the city, and was granted. Thereafter, the case proceeded against the city alone, resulting in a verdict for $125,000 for plaintiff.

On this appeal the city sets forth many claims of alleged error, but they all fall into three main categories. First, it is contended that plaintiff's sole remedy against the city was before the Industrial Accident Commission, and that the superior court had no jurisdiction of the controversy. Second, it is urged that the trial court erroneously instructed the jury that the negligence of the truck driver could not and should not be considered by the jury, thus, so it is claimed, depriving the city of its pleaded defense that the sole cause of the accident was the negligence of the truck driver. The third series of claimed errors center around the basic contention that the judgment is excessive. In addition to the assertion that the judgment is excessive as a matter of law, it is urged that it is partially based on an erroneous assumption in a hypothetical question plaintiff's counsel, over objection, was permitted to ask, and on an erroneous, because incomplete, life expectancy instruction. It is also urged that the trial judge made a misleading suggestion to the jury, during argument, as to the amount necessary to compensate plaintiff for his loss of prospective wages. The judgment is also claimed to be excessive

on the ground that plaintiff is limited to $50,000, the amount set forth in his claim filed with the city. These claimed errors will be considered in order.

*Did the Superior Court Have Jurisdiction of This Action?*

At the threshold of this appeal we are met with the contention that, since plaintiff was admittedly a city employee to whom transportation was furnished as an incident of his employment, he was in the course and scope of his employment when injured, and therefore, so far as the city is concerned, his exclusive remedy was to proceed before the Industrial Accident Commission and secure compensation.

The facts are these: The rules of the fire department and of the streetcar company provide that a fireman may ride on his badge without payment of fare. Admittedly, when plaintiff went to work for the city, he was given a copy of the rule book containing this rule. Plaintiff testified that he had not read this rule and did not know of its existence; that he thought only firemen in uniform could ride on their badges; that a fireman always wears his badge on the vest of his uniform, and that as a temporary noncivil service employee he had no vest; that when he received his badge he placed it in the bureau drawer at home and never removed it; that he did not have his badge with him at the time of the accident; that on the day of the accident he paid his fare on the Geary streetcar with a token, and on the Fillmore streetcar with a transfer. After the accident, his badge was not in his clothing.

There is some conflict as to the exact time of the accident, but the records of the hospital, to which plaintiff was taken immediately after the accident, show that plaintiff was received at 4:10 p. m., so that the accident must have happened about 4 p. m. It occurred only a few short blocks from the firehouse where plaintiff was due to go to work at 6 p. m. Plaintiff testified that he was on his way to the firehouse and that he occasionally arrived early. There is some testimony about the possibility that plaintiff was intending to relieve a regular fireman at 5 p. m., but this could only be done with the consent of the officer in charge given in advance and entered in the books of the firehouse. There was no such entry in the books. There is also evidence that, although a fireman who arrives at his firehouse early does not respond to any fire alarm coming in before the start of his shift, he may so respond with the consent of the officer in charge.

There is also one other evidentiary matter that should

be mentioned. Plaintiff filed his claim with the city on August 19, 1947. One day later, Ralph R. Nelson, the consulting actuary of the San Francisco Retirement Board, wrote a letter to plaintiff in which he stated, among other things, that: "It was the opinion here, on the basis of information received, that your injury did not arise out of and in the course of your employment, as required under the State Compensation Law, and consequently the City and County has no liability in connection with any injury you may have had.

"I well understand that you have not made claim that the injury results from your work, but I thought that this letter should be sent in order to avoid any possibility of misunderstanding." This letter was admitted into evidence over the city's objections. The city claims this was error; that the letter merely stated the informal and erroneous opinion of an employee of the retirement board who had no authority to bind that board. Among other things, plaintiff contends that the entire file of the board was introduced by stipulation, and that the file included this letter. There is no doubt that the file of the board was introduced by stipulation, but it is quite doubtful, in view of the city's repeated objections, that it was intended that the letter should be included in the stipulation.

At the close of the testimony the city moved for a directed verdict on the ground that the exclusive forum with jurisdiction was the Industrial Accident Commission. After some discussion between counsel, the following occurred:

"MR. BELLI: Are you gentlemen willing to submit it to his Honor and let him decide it on—as a matter of law? Are you willing that the question be decided by the Court as a question of law?

"MR. BERGEROT: I think so.

"MR. BELLI: We will stipulate your Honor may decide this as a question of law.

"MR. BERGEROT: Whatever the decision is there will be no argument to the jury about this at all.

"MR. BELLI: That is right, and his Honor will determine the liability."

Thus, this issue was taken from the jury by stipulation of counsel. After some discussion the judge denied the motion for a directed verdict, giving as his reasons: (1) That it was undisputed that plaintiff did not ride on his badge, but paid his fare; (2) that plaintiff was not due at work until 6 p. m. and was hurt at 4 p. m., less than half a mile from his place

of employment; and (3) he did not have to take the Fillmore streetcar to get to work but could have walked, and had he been injured while walking, the city would have resisted paying compensation.

Thus, it is apparent that the admission of the Nelson letter, even if error (a point we do not decide), could not have been prejudicial. The compensation issue, by stipulation, was completely removed from the consideration of the jury. The trial judge did not rely upon the Nelson letter, nor did he refer to it. It could not have affected the jury because the issue involved in the letter was not before the jury.

It is quite clear that counsel agreed that the compensation issue should be decided by the trial judge. It is true that counsel referred to the judge deciding it as a ''question of law,'' but it is important to note that if the issue required a determination of fact based on conflicting evidence, the trial judge was empowered to decide this question of fact. Thus, for example, the city urges that we should consider the reasonable inference that if a man can ride free, he will ride free. That conflict with plaintiff's otherwise uncontradicted evidence that he did pay his fare (if it does present a conflict) was resolved by the trial judge, and his determination must be upheld if supported. Any other factual issue involved in determining the compensation issue, and based on conflicting evidence or upon conflicting inferences from the evidence, must be held to have been decided adversely to the city, and cannot now be considered. The city is in no position to complain that any factual problem involved in this issue was withdrawn from the jury. That was done with its consent. To prevail on this issue the city must accept the facts most strongly against it, and demonstrate that under such facts, as a matter of law, this is a compensation and not a personal injury case. This, the city has not done.

It is, of course, Hornbook law that, generally speaking, injuries received by an employee while going to or coming from his place of employment are not compensable under the Workmen's Compensation Act. It is equally true, and equally as elementary, that ''if an employer, *as an incident of the employment,* furnishes his employee with transportation to and from the place of employment and the means of transportation are under the control of the employer, an injury sustained by the employee *during such transportation* arises out of and is in the course of the employment and is compensable.''

(Italics added.) (*California Cas. Indem. Exch.* v. *Industrial Acc. Com.*, 21 Cal.2d 461, 463 [132 P.2d 815].)

The fact that the employee may pay something for the privilege of riding, or that the transportation is furnished on a conveyance used by the general public is immaterial, if the transportation is furnished and being used as an incident to the employment. (*City etc. of San Francisco* v. *Industrial Acc. Com.*, 61 Cal.App.2d 248 [142 P.2d 760].) The fundamental point is that the transportation must be furnished pursuant to the express or implied terms of the contract of employment.

The city cites many cases from other jurisdictions applying this rule. No useful purpose would be served in reviewing those cases. We think the rule is, and should be, that when the employee, as an incident of his employment, accepts a ride on a means of transportation furnished by the employer, whether the means of conveyance be public or private, the case presents an exception to the going and coming rule and the employee is covered by the compensation act. But that rule is based on the theory that the means of transportation is included within, or is an incident to, the contract of employment; that is, that the employer is obligated, expressly or impliedly, to furnish it, and that it is being used as an incident of the employment at the time the injury is received. (*California Cas. Indem. Exch.* v. *Industrial Acc. Com.*, *supra*, 21 Cal.2d 461; Campbell, Workmen's Compensation, vol. 1, § 173, p. 162.) That implies that the employee knows that he is entitled to ride on the transportation thus furnished, and he must, in fact, be so riding when injured. In the instant case the employee did not know that he was entitled to ride free on the city streetcars upon presentation of his badge. He so testified, and even if there is a conflict, that conflict has been resolved in favor of plaintiff. The public, upon paying a fixed fare, likewise uses the streetcars. At the time of the accident, the employee in fact had paid his fare—the same fare paid by the general public. He was, therefore, riding as a passenger, and not as an employee.

The rule of the fire department entitling firemen to ride free was undoubtedly part of the contract of employment. But under that contract, even if plaintiff knew or should have known of its provisions, plaintiff was entitled to ride free only upon presentation of his badge. Under the evidence the employee did not comply with the conditions—he did not

present his badge. Under such circumstances the employer was not required to furnish free transportation, and the employee was not entitled to a free ride. He, in fact, paid for the ride. Under such circumstances it cannot be reasonably contended that he was riding pursuant to his contract of employment or as an incident thereto. He was clearly riding the streetcar as a passenger, that is, as a member of the public, and not as an employee. That being so, he was not covered by the Workmen's Compensation Act.

### *Was the City Prejudicially Deprived of Its Defense That the Sole Proximate Cause of the Accident Was the Negligence of the Truck Driver and Its Owners?*

The city contends that by the instructions of the trial court it was prejudicially deprived of one of its main defenses —that is, that the accident was proximately caused by the negligence of the truck driver in parking his vehicle in violation of the law. As already pointed out, on the motion of counsel for the truck driver and its owners, the trial court, without opposition from plaintiff or the city, granted a nonsuit to these defendants. The trial judge, during the argument, pointed out to the jury that he had granted the motion because he had become convinced that the truck driver and its owners were not negligent and were not liable for the accident. In its instructions, the court, after first pointing out that the driver of the truck and its owners originally had been parties defendant, stated: "During the course of the trial, pursuant to legal motions made by Mr. Painter, the attorney for those defendants, they were let out of this case and are not to be considered at all in your deliberations.

"Those were legal motions made, which were to be decided by me, and I granted them. So that responsibility is solely mine. So the truck, either the owners, renters or driver, are not to be considered by you in your deliberations in this case." Then, after pointing out that the only two litigants in the case were the plaintiff and the city, the court stated: "Those are the only two parties you are to consider in your deliberations." The court refused to give certain instructions proposed by the city to the effect that if the jury should find that the truck was negligently parked, and such negligence was the proximate cause of the accident, the city should be exonerated. Of course, the jury was fully instructed to the effect that plaintiff could only recover if the jury found that the city was negligent. The city contends that there was evidence

of the negligence of the truck driver, and that under these circumstances it was deprived of showing that the accident was proximately caused by such negligence, which was one of its main defenses.

In considering the validity of this contention certain rules of law must be kept in mind. Of course, if there was any evidence from which the jury might have found that the truck driver was negligent and that his negligence was a proximate cause of the accident, it was error to grant the nonsuit. But the plaintiff has not appealed. He is not complaining. The city, as a joint tort feasor, has no legal right to complain that another joint tort feasor was improperly exonerated from liability, there being no right of contribution between joint tort feasors. (*Frazzini* v. *Cable,* 114 Cal.App. 444 [300 P. 121] ; *Bezera* v. *Associated Oil Co.,* 117 Cal.App. 139 [3 P.2d 622] ; *Adams* v. *White Bus Line,* 184 Cal. 710 [195 P. 389].)

The city does not and cannot complain that the driver of the truck and its owners were released, even erroneously. But the city does urge that there was evidence that the truck driver was negligent. Therefore, says the city, the court's action in instructing that the negligence of the truck driver was not to be considered deprived the city of its defense that the accident was proximately caused solely by the negligence of the truck driver. The city contends that it can always urge that an accident happened solely as the result of the negligence of a third person, whether such third person is a party or not, and that to deprive it of that defense was to commit prejudicial error. Many cases are cited which undoubtedly support that general rule. Most of them seem to be cases where two moving vehicles collide and injure the plaintiff, under circumstances where either or both could be liable. Under such circumstances, to instruct erroneously that one of the persons that could have been the sole cause of the accident cannot be considered would be prejudicially erroneous and would irreparably injure the defense of the other party. Citation of authority is not necessary to establish so elementary a proposition. But for that rule to apply, the case must be one where the evidence shows not only that the negligence of two actors may have caused the accident, but also that the negligence of either one may have been the sole proximate cause. That is not the present case.

The jury has found, and the finding is supported by overwhelming evidence, that the city was negligent and that such

negligence was a proximate cause of the accident. The jury was fully and fairly instructed that the city could only be held liable if the jury found that it was negligent, and also found that such negligence was a proximate cause of the accident. Assuming that the evidence shows that the truck driver was negligent and that his negligence may have been *a* proximate cause of the accident, the evidence also demonstrates not only that the city was negligent, but that its negligence, at least, was *a*, if not *the*, proximate cause of the accident. The motorman of the streetcar testified that he saw the parked truck, and stopped the streetcar; that both he and the conductor took a "sight" to see if the streetcar could pass; that it looked pretty "close" to him, that it looked "tight"; that it looked "doubtful"; that the conductor signalled him to go ahead, and that he proceeded ahead slowly; that it "still looked close"; that he stopped when the streetcar was about halfway past the truck; that he did not then look to see if the rear of the car would clear the truck, but left that up to the conductor; that the conductor signalled him to go ahead, and he proceeded ahead and was "picking up speed" when he heard a "thud" and stopped. The conductor testified that he looked at the streetcar and truck when the streetcar first stopped; that he thought the streetcar could get by; that when the streetcar stopped the truck was "pretty close to the streetcar," but he believed it would clear; that he gave the signal to go ahead; that when the motorman stopped the second time he looked again, opening the doors for this purpose; that he still believed the streetcar would clear, and so signalled the motorman to proceed; that he did not keep a lookout but closed the doors and turned around to his fare box and was winding it up when he heard the crash.

Thus, we have an unoccupied, nonmoving parked truck. We have a moving streetcar. We have a passenger—the plaintiff—to whom the highest degree of care was owed. We have a motorman and conductor both aware of the danger but who negligently misjudge the distance, and plaintiff is injured as a result. The negligence of the city is obvious. The finding of the jury that the city was negligent is not only supported, but it is doubtful if a contrary finding would be supported by any substantial evidence at all. If it be assumed that the truck driver was also negligent, since the truck was parked and at no time moved prior to the accident, it is obvious that a finding that the assumed negligence of the truck driver was *the* proximate cause of the accident, and that the demonstrated negli-

gence of the city was not *a* proximate cause of the accident, as a matter of law, would not be supported by the record. In other words, even if it be assumed that the truck driver was negligent, since the truck was not moving and the streetcar was, and since the streetcar operators were clearly negligent, the most the jury could have found would have been that the negligence of both the city and the truck driver caused the accident, that is, that their respective acts of negligence were concurrent causes of the accident. Since the city was clearly negligent, there is no rational interpretation of the evidence that would support any other conclusion but that such negligence was at least *a* proximate cause of the accident. While the truck driver, if negligent, might contend, and the jury might have found, that the intervening act of negligence of the city broke the chain of causation, and that such negligence was the proximate cause of the accident, the city reasonably can make no such contention. Under the facts if the city was negligent, and the evidence is overwhelming that it was, such negligence, as a matter of law, was at least a concurrent cause. This being so, even if the nonsuit as to the driver and owners of the truck was erroneously granted the city was not prejudiced, since one joint tort feasor has no legal cause for complaint if another tort feasor is relieved of liability, even erroneously, there being no right of contribution between them.

This is a complete answer to every contention made by the city on this point.

The above discussion has assumed that the truck was parked in violation of the law, and that, therefore, the nonsuit as to the driver and owners of the truck was erroneous. As we have seen, even with that assumption, the city has not been legally injured. Of course, if, as a matter of law, the truck driver was not negligent, and therefore the nonsuit was proper, then the city has no cause for complaint at all.

The city contends that there was evidence from which the jury could have found that the truck was parked in violation of the law. This contention is probably correct, although the evidence on this issue is very slight indeed.

Section 588 of the Vehicle Code provides: "(a) Except as otherwise provided in this section every vehicle stopped or parked upon a roadway where there are adjacent curbs shall be so stopped or parked with the right-hand wheels of such vehicle parallel with and within 18 inches of the right-hand

curb. . . . This paragraph shall not apply to a commercial vehicle when loading or unloading merchandise or passengers.''

Wilkinson, the driver of the truck, testified that he had driven the truck to Fillmore Street so that he could help some fellow employees load a clothes press into another waiting truck. He drove head on into the parking place, the front wheel going up on the curb and down again. There is no doubt that the front wheels were closer to the curb than the back wheels. Wilkinson testified that the right front wheel was 5 or 6 inches from the curb, and the outer of the right back wheels (dual tires) was possibly 12 inches from the curb. He had fixed this distance as about 16 inches when his deposition was taken. The city makes an argument based upon the evidence as to the distance between the car tracks, the distance from the west track to the west curb, the width of the street, the maximum overhang of the streetcar, the width of the truck, and contends that such measurements demonstrate that the truck was parked more than 18 inches from the curb, but apparently no one saw fit to measure the overhang of the truck over its wheels—a most pertinent factor in making the computation desired by the city. The truck was moved very shortly after the accident, so that no accurate measurements seem available. One witness, whose story about the accident differed radically from all other witnesses, did testify that the truck, when parked was ''two—two and a half feet away from the sidewalk.''

Thus there was probably evidence, weak evidence but some evidence, that the truck was parked in violation of the law. Thus, the nonsuit should not have been granted in favor of the driver and owners of the truck. But, as already pointed out, the city cannot complain of this error, and the plaintiff has not appealed.

### The Amount of the Verdict

The third group of errors asserted by the city center around the contention that the award of $125,000 is excessive as a matter of law, and that prejudicial error occurred during the trial relative to the issue of damages.

Counsel on both sides devote a large portion of their briefs to a consideration of the question as to whether or not the damages are excessive as a matter of law. Many cases from other jurisdictions and from California are exhaustively discussed and commented upon. Each case, of course, must turn upon its own facts. While $125,000 is a large sum of money, and while it perhaps represents the largest verdict that has

heretofore come before an appellate court in this state, those facts are not conclusive. The jury has fixed this amount as the damages suffered by plaintiff. The trial judge has impliedly approved the award by denying the motion for a new trial. ██ We may interfere only if it appears, as a matter of law, that the award was the result of passion or prejudice. ██ In the instant case we cannot so hold. We have so recently reviewed this same question of law in *Gluckstein* v. *Lipsett*, 93 Cal.App.2d 391 [209 P.2d 98] (hearing in Supreme Court denied), that it is unnecessary to do any more than quote from that case. At page 400 we stated: "The test to be applied in cases where it is contended that the damages awarded are excessive was stated by us in *Buswell* v. *City & County of San Francisco*, 89 Cal.App.2d 123 [200 P.2d 115], to be (p. 127) 'a comparison of the amount of the verdict with the evidence before the trial court.' Taking into consideration the disfigurement, the humiliation, the pain and the malignancy, we cannot say that the award of $115,000, large as it is, is so far out of line as to show passion and prejudice on the part of the jury. It is not a question of what we would award (*Nason* v. *Leth-Nissen*, 82 Cal.App.2d 70 [185 P.2d 880]), but whether we can hold that it indicates that type of action by the jury. 'Generally speaking, . . . if there is substantial evidence in the record supporting the damages awarded by the jury and it is inferentially approved by the trial judge by his denial of a motion for new trial without reducing the damages, we are powerless to reduce them or to hold the award excessive.' (*Holmes* v. *Southern Cal. Edison Co.*, 78 Cal.App.2d 43, 52 [177 P.2d 32].) In considering the amount of the verdict, we must bear in mind the present day situation as expressed in *Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176, 187 [195 P.2d 427]: 'It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [Citing cases] . . .' "

When these rules are applied to the facts of this case it is abundantly clear that this is not a case in which it can be held that the verdict is excessive, as a matter of law.

The injuries are severe, permanent and painful. The record shows the following: At the time of the accident plaintiff was 21 years of age. The average life expectancy of a male of 21 is 44 years. He was earning $260 a month in the fire depart-

ment, and hoped to work for that department the rest of his life. He was in good health, and had just passed the fire department physical examination. He had been married in April of 1947, and was living with his wife. She had become pregnant just before the accident and the baby was born in May of 1948. In the accident his entire pelvic region was crushed. He sustained four comminuted fractures of the pelvis and a fracture of the transverse process of the fifth lumbar vertebra. The pelvic bones are permanently displaced. At the time of trial (July, 1948) he still suffered from backache and had difficulty in walking. His doctor testified that it was reasonably certain that he would have a backache the rest of his life. Arthritis will probably develop. He has had severe headaches since the accident. He had a deep wound of the thigh. He suffered a rent around the neck of the bladder, which was sutured. He suffered a ruptured urethra, which was sutured. He has a scar tissue stricture at the site of this rupture which causes him trouble in urinating, he being unable completely to empty the bladder. He is required to urinate 11 or 12 times a day, and 7 or 8 times every night. No operation can cure the urethral stricture, and it is necessary to pass a sound through the urethra and into the bladder every ten days in order to empty the bladder by stretching the scar tissues. This will have to continue at such intervals the balance of the patient's life, there being no other known treatment. If it is not performed the patient will die. This operation is quite painful, is performed under local anaesthetic, and usually causes bleeding. Plaintiff is highly nervous before the dilations, is in a cold sweat at the start, and in a worse condition afterwards. As a result of the dilations plaintiff has a mild chronic prostatitis, with increase in size of the prostate, which is unusual in a young man. Plaintiff can never again do any hard work, but will be able to do light work. He had done no work up to the time of trial.

As a result of the accident plaintiff was confined to the hospital for three months. Thereafter, he remained in bed at home for one month and has since been ambulatory. He had three severe operations performed under general anaesthetic. Four blood transfusions were required to save his life. He has been required to return to the hospital on two occasions for three-day intervals, once for a urethral dilation and once for cystoscopy.

Before the accident plaintiff weighed 185 pounds. After-

wards, he went down to 140, and at the time of trial weighed 168 pounds.

It is reasonably probable that, as a result of the accident, plaintiff will be impotent the rest of his life. Before the accident he had led a normal family life, but since that time has had no desire for sexual intercourse. Impotence "is a very common complication with rupture of the urethra." There is evidence the impotency "probably" will be permanent, and that it "frequently" follows this type of injury.

There is substantial evidence that he has developed a definite psychoneurosis as a result of the accident which will increase as time goes on, and may result in a breakdown.

The special damages suffered by plaintiff total $25,000. They were loss of wages to time of trial—$3,000; hospital bills—$3,000; doctors' bills—$4,000; prospective future medical expense reasonably certain to occur—$15,000. Thus, $100,000 of the judgment was awarded to compensate for the injuries, for the pain and suffering, and for the loss of earning power. Under the rules of law heretofore mentioned we cannot hold that such an award, for such injuries and damage, is excessive, as a matter of law.

*Other Points Relating to the Issue of Damages*

1. *Hypothetical Question.*

The city next objects to a portion of a hypothetical question asked by counsel for plaintiff of Dr. Catton, in which counsel assumed, allegedly without foundation in the evidence, that plaintiff would be impotent for the rest of his life. The record shows the following:

"Q. [Mr. Belli] . . . Assuming also, Doctor, with the rupture of the prostatic urethra membrane near the neck of the bladder, he has become impotent, that he will remain impotent, not sterile, but impotent for the rest of his life. He knows he is presently impotent.

"MR. BERGEROT. [For defendant] : Just a moment. At that point, I think it is an improper question, and that he will remain impotent it is something not in evidence, he will remain impotent for the rest of his life.

"MR. BELLI : I think that is the state of the record.

"THE COURT : I will overrule the objection.

"MR. BELLI : Q. Assuming, Doctor, he knows he will remain impotent for the rest of his life, and assume further that as far as we can determine presently as to his mental condition, before the accident he was a normal boy, . . ."

The record shows that Dr. Catton's answer to this question was, in part, based on the assumption contained in the question.

Plaintiff testified that prior to the accident his sex life had been normal, but that since the accident he had had no desire for intercourse. There was evidence that plaintiff feared impotency. The doctors testified that it was reasonably probable that plaintiff would be impotent—that impotency is a "very common complication" following such an injury; that the existing impotency "probably" will be permanent and "frequently" follows such an injury. Although there is some testimony to the contrary, it is a reasonable inference from the testimony of plaintiff's doctors that the probability of permanent impotency was great.

A hypothetical question should be based upon the facts shown by the evidence. (*Snow* v. *Harris*, 41 Cal.App. 34, 37 [181 P. 676]; *Coonan* v. *Loewenthal*, 129 Cal. 197, 202 [61 P. 940]; *Rowe* v. *Such*, 134 Cal. 573, 576 [66 P. 862, 67 P. 760].) While there is no direct testimony that the impotency would positively be permanent, the plaintiff did testify that he was then in fact impotent and the doctors were reasonably certain such condition would be permanent. It is a reasonable inference from the evidence that the impotency will be permanent. A party is entitled to base his hypothetical question on any reasonable inference from the evidence, it being for the jury to decide whether such inference is sound. Thus, there was some evidence upon which the hypothetical question was based. The question was a proper one.

### 2. *Propriety of Instruction of Life Expectancy.*

At plaintiff's request the jury was instructed that plaintiff's life expectancy was 44 years. The instruction reads as follows:

"According to the 1937 Standard Annuity Table of mortality, the expectancy of life of one aged 22 years is 44 years.

"This fact, of which the Court takes judicial notice, is now in evidence to be considered by you in arriving at the amount of damages, if you find that plaintiff, Frank R. Sullivan, Jr., [is] entitled to a verdict."

The record shows that the city offered no qualifying instruction, but nevertheless it contends that the court, on its own motion, should have qualified the proffered instruction with language to the effect that life expectancy as shown by

the mortality tables is a mere average based on a limited record of experience, that the inference based on such tables only applies to one who is in average health, and that the jury must consider not only the mortality tables but all the evidence bearing on the same issue.

There is no doubt but that such a qualification, had it been given, would have been proper, but it does not follow that failure to give it, at least where not suggested by the complaining party, is error. Thus, in *Murphy* v. *National Ice Cream Co.*, 114 Cal.App. 482 [300 P. 91], the trial court gave the same type of instruction here involved. After first holding that the form of the instruction was subject to criticism the appellate court stated (p. 487) : "However, it does not follow for several reasons that a reversal is warranted on that ground, for in the first place it is held generally that in the absence of a request for more specific instructions it is not reversible error for the court to instruct the jury that life tables might be considered as evidence of the life expectancy of a person, without instructing further that it should take into account in this respect all the evidence relating to the health and physical condition of such person. [Citing many cases.] And in the present case, no such request was made, nor was any instruction whatever proposed by defendants upon the subject."

The court also pointed out that the fact that no individual's life is capable of definite computation is such a matter of common knowledge that the jury could not possibly have been misled.

In discussing the identical point under discussion the court in *Newman* v. *Campbell*, 23 Cal.App.2d 639, 641 [73 P.2d 1265], stated: "The mortality table was admissible and, although not conclusive, was evidence of the probable duration of her life. Under the evidence she was entitled to an instruction based upon her theory of the case. (*Groat* v. *Walkup Drayage etc. Co.*, 14 Cal.App.2d 350 [58 P.2d 200] ; *Morrow* v. *Mendleson*, 15 Cal.App.2d 15 [58 P.2d 1302].) If the appellant desired an instruction explaining in more detail the weight to be given the elements fixing her life expectancy, as was the case in *Groat* v. *Walkup Drayage etc. Co., supra,* such an instruction should have been offered. This was not done, and in the circumstances appellant has no ground for complaint. (*Murphy* v. *National Ice Cream Co.*, 114 Cal.App. 482 [300 P. 91].)" See, also, *Christiansen* v. *Hollings*, 44 Cal.App.2d 332, 341 [112 P.2d 723].)

It is quite clear that, under the circumstances, no error was committed in giving the challenged instruction without the limitation.

3. *Remarks of Trial Judge.*

In a somewhat far-fetched attempt to upset the verdict, the city complains of a remark by the trial judge made during argument of the cause. Counsel for plaintiff, in arguing what the amount of plaintiff's prospective damage might be, pointed out that even if plaintiff's earning power was only reduced $150 a month, for 44 years that amounted to $66,000. The trial judge interrupted him and stated: "You have also made a mistake in your mathematics. I think if you take 44 times 150 you will get the sum of $79,200 instead of $66,000 . . . 44 times 1800 a year, . . . comes to 79,200."

Contrary to the contention of the city, there was no suggestion by the trial judge that this was the sum that the jury should allow to compensate for loss of plaintiff's wages. The trial judge was merely correcting an erroneous computation made by counsel. This he had power to do.

4. *The Point in Reference to the Amount of the Claim.*

As already pointed out, the claim filed by the plaintiff with the city—filed while he was still in the hospital—was for $50,000. Plaintiff then filed a complaint for $50,000, and thereafter, by motion, sought permission, which was granted, to file a second amended complaint in which the demand was increased to $150,000. The city contends that plaintiff is limited to the amount set forth in the original claim.

The contention lacks merit. While the filing of a claim is mandatory in such cases, literal compliance with the claim statute is not required—substantial compliance is sufficient. (*Coen* v. *City of Los Angeles,* 70 Cal.App. 752, 766 [234 P. 426]; *Knight* v. *City of Los Angeles,* 26 Cal.2d 764 [160 P.2d 779]; *Perry* v. *City of San Diego,* 80 Cal.App.2d 166 [181 P.2d 98].)

It seems too clear to require extended argument that, in a proper case, an injured person should not be limited arbitrarily to the amount of his claim. Such claims must be filed within a very short time after the accident. Many times, as in the instant case, the claim must be filed while the injured person is still in the hospital and before the extent of his injuries is known. If it were held that the injured person is absolutely limited to the amount of his claim filed before

the injuries caused by the governmental agency have been definitely ascertained, grave injustices would necessarily result, as the instant case demonstrates. Moreover, it would result in lawyers always filing excessive claims, out of an abundance of caution, and thus tend to prevent the settlement of such claims—one of the major reasons for the requirement of filing the claim.

While we have been referred to no California case dealing with the precise point, there is fortunately no lack of authority from other jurisdictions. The point is discussed in an annotation in 75 American Law Reports, page 1511 entitled "Amount of damages named in notice of claim against municipality as limiting amount of recovery." It is there stated: "Although there are some cases in which a contrary conclusion has been reached, it has been generally held, both under statutes providing that a notice or claim for damages must be presented to municipal authorities in order that recovery may be had and apart from such statutes, that the amount claimed in the petition or notice does not necessarily limit or control the amount which may be recovered in an action to enforce the claim. It will be seen that this view has been taken even under statutes which require that the notice state the amount claimed." Cases supporting this view are cited from Georgia, Kansas, Michigan, Minnesota, New Hampshire, New York, Oklahoma, Rhode Island, Utah, Washington and Canada.

This view is sound. ▆▆ The claim provision is primarily aimed at permitting the governmental agency, at an early date, and before witnesses have disappeared, to investigate the facts and, if possible, to settle the controversy. The investigation having been made, and the claim rejected, suit may be filed, as in any case, for the total amount of damage. ▆▆ There was no error in permitting the amendment.

The record demonstrates that the case was fairly tried, the jury was fully and fairly instructed, and that no prejudicial error occurred during the trial.

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied February 25, 1950, and appellant's petition for a hearing by the Supreme Court was denied March 27, 1950. Shenk, J., voted for a hearing.