[Civ. No. 19155. Second Dist., Div. Three. Feb. 27, 1953.]

ROBERT E. FALL, Respondent, v. COASTWISE LINE (a Corporation), Appellant.

Lasher B. Gallagher for Appellant.

Tanner & Thornton and Dee B. Tanner for Respondent.

VALLEE, J.—Appeal by defendant from a judgment for plaintiff entered on a verdict in an action for damages for personal injuries brought under the statute of the United States known as the Jones Act. (46 U.S.C.A. § 668.)

The accident occurred on June 28, 1950. Plaintiff was employed at the time by defendant as an able-bodied seaman aboard the S.S. Joel Chandler Harris. The ship was moored at Long Beach with its starboard side to the dock. The crew was engaged in the discharge of a deck cargo of steel rails from the portside onto railroad flatcars on the dock by means of the ship's steam winches. The rails lay fore and aft, were of uneven lengths, and were being discharged in lots of five to eight rails.

The loads were made up by seamen from the pile on the deck by placing a sling at each end and hooking the slings onto the cargo hook. The winch driver had sole control of the movement of the loads. When a sling had been placed at each end of a load and the slings had been hooked to the cargo hook, it was the duty of the winch driver to test the load by lifting it off the deck to determine whether it balanced evenly in the slings. If a sling slipped, he put the load down

on the deck and the seamen readjusted it. If the load hung evenly, the winch driver, by operation of the port winch, lifted the load vertically high enough to clear the hatch coaming. The seamen then turned the load so that it went out athwartship and the winch driver pulled it horizontally to starboard and onto the dock by operation of the starboard winch.

On the day of the accident, plaintiff and three other seamen hooked slings to a load of seven or eight rails weighing between one and two tons. Plaintiff and a partner were at the forward end and the other two were at the afterend. Plaintiff was on the inboard side nearest the portside of the No. 3 hatch; his partner on the outboard side of the port gunwale. Plaintiff and his partner placed a sling around the forward end of the load. The slings were hooked to the cargo hook; the winch driver tightened them and tested to see if the load hung evenly. The forward sling slipped toward the center of the load; plaintiff adjusted it; it was secure; the load was in position to go up; and the winch driver then lifted it vertically several feet off the deck. Because there was no room for it on the dock he left it hanging. Plaintiff, with his back to the winch driver, stood watching the load, prepared to guide it athwartship. Suddenly the winches ran wild: the winch driver had left his post at the controls without shutting off the winches. The load jerked forward toward plaintiff and to starboard with the rails hitting the deck and bouncing. Two seamen jumped for the winch controls and shut off the steam. Plaintiff attempted to escape from the careening rails, but he was hit by one or more of them, and was knocked to the deck against a masthouse. His left foot and ankle were crushed against a steam pipe guard, virtually severing the foot from the leg at the ankle.

Defendant, at the trial, conceded it was negligent and that its negligence was a proximate cause of the injury. It pleaded contributory negligence. It does not contend here that plaintiff was guilty of contributory negligence as a matter of law. Its assignments of error are: (1) The statutory requirements covering the impanelment of a jury were violated; (2) the court erred in excluding evidence offered by defendant; (3) the court erred in refusing to give instructions requested by defendant and in giving instructions on its own motion and at the request of plaintiff; and (4) the verdict is excessive and not sufficiently supported by the evidence.

1. When the cause was called for trial, and after all the

prospective jurors in the courtroom had been sworn and 12 were in the box, and before they were questioned, defendant challenged and objected "to the panel as a whole, and to each prospective juror on the panel, on the ground that the method of impaneling the jury is illegal and unlawful, and not in accordance with the provisions of the statute set forth in the Code of Civil Procedure in the following respects: 1. The names of the jurors are not kept in any locked box, nor was such box ordered to be opened by the court. 2. The names of the jurors are on flat pieces of paper, not folded, and are contained in a tin box which is unlocked, and was unlocked and brought into this courtroom by one of the prospective jurors, which one the record does not show." The challenge and objection were forthwith denied. After a number of jurors had been examined for cause and several had been challenged peremptorily, the court stated it wished to augment the record by showing the manner in which the jurors "are handled" when they arrived in the department in which the cause was on trial. The clerk of the department then was sworn and testified: When the jurors come into the courtroom, one of them bears a metal box; the juror carrying the box hands it to the bailiff who hands it to me; in the box there is a small sealed paper envelope and on the envelope, the number of the department; the envelope is left sealed in the box; when the court called this case, I opened the envelope and dumpd the slips in the metal box which was then sitting on top of my desk; the slips were flat pieces of paper sent over by the jury commissioner; in filling the jury box I drew one slip at a time from the box; I did not look at the slips before I drew them; the metal box was not locked; I did not receive any directions or order from the court before opening the box and taking the envelope out; the slips of paper were about four inches long and one and a quarter inches wide; they remained flat at all times. Defendant then again challenged "each juror now sitting in the box for cause, and also challenged the panel as a whole for cause" on the grounds previously stated and on the further grounds that defendant "has been and will be deprived of due process of law as guaranteed by the Thirteenth [Fourteenth] Amendment to the Constitution of the United States; and also that it has been and will be deprived of equal protection and/or the equal application of the laws of the State of California."

Plaintiff objects to our consideration of the point on the ground a challenge to the panel does not lie in a civil case

and that defendant did not challenge any individual juror
for cause. A challenge to the panel does not lie in a civil
case. (*Livesey* v. *Stock*, 208 Cal. 315, 321 [281 P. 70].) We
think, however, that the challenge was in effect an objection to
the service of the jury on the grounds stated and that the
point is properly before us.

Sections 204 to 211 of the Code of Civil Procedure provide
the method of selecting and returning the trial jurors in the
superior court. In Los Angeles County the judges semiannually
select persons to serve from lists of qualified individuals fur-
nished by the jury commissioner. Certified lists of the persons
selected by the judges are filed with the clerk of the court.
On receiving the lists, it is the duty of the clerk to write down
the names contained on the lists "on separate pieces of paper,
of the same size and appearance, and fold each piece so as to
conceal the name thereon," and to deposit such pieces of
paper in a box called the "trial-jury box." The persons whose
names are so returned are known as "regular jurors." They
serve during the ensuing year or until a new list is required.
The names are to be drawn from this "trial-jury box" as
jurors are needed for trial service.

Sections 214 to 227 provide for the drawing and summon-
ing of trial jurors to attend before the court. When trial
jurors are needed the court makes an order directing a
specific number to be drawn and summoned. The clerk, in
the presence of the court, draws the slips from the "trial-jury
box." After the drawing is completed, the clerk makes a list
of the names drawn, certifies it, and delivers it to the sheriff
for service. The sheriff is required to summon the persons on
the list. The provisions to which we have referred are in part
I of the Code of Civil Procedure treating of "Courts of Jus-
tice" in general.

Sections 246 to 248, also in part I, relate to the manner of
selecting trial jurors from those summoned. Section 246
provides that "the clerk shall call the names of those sum-
moned, and the court may then hear the excuses of jurors
summoned; . . . the clerk shall then write down the names
of the jurors present and not excused upon separate slips
or ballots of paper, and fold such slips so that the names
are concealed, and there, in the presence of the court deposit
the slips or ballots in a box, which must be kept sealed or
locked until ordered by the court to be opened." Section 248
provides that in a county having two or more judges, one
panel may be drawn, summoned, and impaneled by any one of

the judges for use in the trial of cases before any two or more judges as occasion may require, and the whole or any number of jurors from such panel may be required to attend and serve in the trial of cases or to complete a panel or jury before any of the other judges.[1]  Section 247 provides: "Whenever thereafter a civil action is called by the court for trial, and a jury is required, such proceedings shall be had in impaneling the trial jury as are prescribed in part two of this code."

Part II of the Code of Civil Procedure treats of "Civil Actions." Chapter IV of title VIII, part II treats of "Trial by Jury." Article I thereof (§§ 600-604) prescribes the manner of formation of a trial jury in a civil action. Section 600 reads: "When the action is called for trial by jury, the clerk, or the justice where there is no clerk must draw from the trial jury box of the court the ballots containing the names of the jurors, until the jury is completed, or the ballots are exhausted."

It does not appear that the method prescribed for selecting, summoning, and returning the trial jurors prior to the time they were sent to the trial department in the present case, was not followed.  We must presume it was followed. (Code Civ. Proc., § 1963 (15).)  We think that when analyzed the statutory provisions differentiate between the "trial-jury box" used prior to the time jurors are sent to a trial department and the "trial jury box" referred to in section 600 from which the names of the jurors are drawn when the jury to try an action is formed in a trial department. (See 15 Cal.Jur. 401, § 72, n. 11.)  This would seem obvious as only one "trial-jury box" is required to summon and return trial jurors for service while many boxes may be necessary to send jurors to trial departments.  The "trial-jury box" in which the clerk must place the folded separate slips of paper is the one used when trial jurors are needed for service in the court as distinguished from a separate department of the court. The sections in part I, to which we have referred, relate exclusively to the setting apart of a sufficient number of persons eligible for jury duty from whom may be drawn and brought into court from time to time, as many jurors as are required to render actual service. (*Halsey* v. *Superior Court,* 152 Cal. 71, 77 [91 P. 987].) Those persons are known as "regular jurors." They serve for one year and until other persons are selected and returned. They are avail-

---

[1] Section 248 was amended in 1951.  Stats. 1951, ch. 1495 § 9.

able for service in all departments of the court. We understand it is the practice in Los Angeles County to assemble the "regular jurors" in one department and to send the required number to trial departments as needed. The names of those so sent on slips of paper of similar size and appearance are placed in an envelope, the envelope is sealed and placed in a metal box, and the unlocked box, with the sealed envelope in it, is then taken by one of the jurors to the clerk of the trial department. This we think is the "trial jury box" referred to in section 600. The clerk, on receipt of the box, proceeds in the fashion described in the testimony to which we have referred. We find nothing in this procedure contrary to the statutory provisions. The statutes do not provide that when "regular jurors" are sent to a trial department the slips or ballots of paper on which thier names are written shall be folded nor that the box in which they are sent shall be kept locked until ordered by the court to be opened.

2. A witness called by defendant who had been a seaman for many years and a master of a lumber schooner since November, 1950, was asked a hypothetical question as to whether in his opinion a man in plaintiff's condition would be qualified physically to perform the duties of an able-bodied seaman. Plaintiff's objection was sustained. Defendant assigns error. The objection was apparently sustained on the ground the witness was not qualified to express an opinion on the subject. ▮ The qualifications of a witness to testify as an expert is a matter within the sound discretion of the trial court; and where there is no showing of a clear abuse of that discretion, the ruling will not be disturbed on appeal. (Cases collected—21 West's Cal.Dig. 605, § 546.) ▮ No such showing is made. The question merely assumed the present condition of plaintiff's foot and ankle as testified to by some of the medical experts. The witness was not shown to have ever known any seaman, who, after an injury similar to that sustained by plaintiff, was able to go to sea and do actual work. There was no error.

▮ 3. One Marie Allison was called as a witness by defendant. Defendant sought to show that her husband had worked steadily as an able-bodied seaman for about 25 years; that during all of that time he had an "absolutely stiff knee"; and that he is now over 60 years of age and is still working in spite of the stiff knee. On objection of plaintiff, the witness was not permitted to give the testimony. Defendant assigns

error. There was no error. The witness did testify that her husband is a boatswain on ships; she had been married 25 years; her husband was working in the merchant marine at that time; "he is a cripple; he has a stiff knee." ▮ Assuming the admissibility of the proffered evidence, without so deciding, its exclusion was harmless. The facts defendant sought to establish by the witness were fully testified to by other witnesses. It is trite to say that the exclusion of evidence is harmless where the facts sought to be proved were amply proved by other evidence. Further, counsel for defendant argued the facts fully to the jury.[2]

4. Defendant requested the court to give the following instructions to the jury: (a) "While the defendant is under the burden of proving contributory negligence on the part of the plaintiff by a preponderance of the evidence, you are instructed that if contributory negligence appears from or is shown by the evidence which the plaintiff has introduced in support of his own case, there is no necessity that the defendant offer any evidence whatever upon that subject." (b) "In determining whether contributory negligence has been proved by a preponderance of evidence, you must consider all the evidence bearing either way upon that question, regardless of which of the parties produced it. The defendant is entitled to the same benefit from evidence that favors its contention that the plaintiff was guilty of contributory negligence when produced by the plaintiff as when produced by the defendant. Thus, if the evidence presented by the plaintiff himself supports a finding that he was guilty of contributory negligence, that finding would be adequately supported even if the defendant produced no additional evidence to the same effect." The court modified instruction (a) and gave it as follows: "The defendant is under the burden of proving contributory negligence on the part of the plaintiff by a preponderance of the evidence. All of the evidence on this point is to be considered by you, whether produced by the

---

[2]Defendant's counsel argued: "We have the testimony showing the condition of Ben Allison, a totally stiff knee for years, but nevertheless, to Captain Barry's personal knowledge, for fourteen years he has been able not only to do his job as an able seaman but to do it well, and Captain Barry said that he was a good man. Who can dispute the fact that Ben Allison is a good man? He is over 60 years of age, the testimony shows, married 25 years to this lady who took the stand, and she testified that he has been crippled since World War I, but nevertheless he gets up and down ladders, he does chipping and painting, he climbs up and down to these loads of lumber, and he makes $100 a week take-home pay."

defendant or the plaintiff." Instruction (b) was refused. Defendant assigns error. ■ The argument is that since defendant conceded actionable negligence on the part of the winch driver, the question of contributory negligence was the vital issue in this case; therefore defendant was entitled to have the jury specifically instructed with respect to contributory negligence and the burden of proof in that respect, and that the instruction given was not specific. Conceding the premise, the conclusion does not follow. The instruction as modified and given contains virtually the same language as the instruction proffered, and it plainly stated that in determining the question of contributory negligence the jury should consider all the evidence on the point, including that of plaintiff. ■ It is not error to refuse to give a requested instruction if the subject matter is incorporated in the instructions given. (24 Cal.Jur. 806, § 79. See, also, *McNulty* v. *Southern Pac. Co.,* 96 Cal.App.2d 841, 856 [216 P.2d 534]; *Richmond* v. *Moore,* 103 Cal.App. 173, 180 [284 P. 681].)

5. Defendant proffered and the court refused to give the following instruction: "In the event the plaintiff did any act which such ordinarily prudent able seaman would not have done under the circumstances or if the plaintiff failed to perform some act which such ordinarily prudent able seaman would have performed under the circumstances, then you must find that the plaintiff was guilty of negligence. If the plaintiff was guilty of negligence and such negligence was a proximate cause of his injury then the law requires that the damages shall be diminished by the jury in proportion to the amount of negligence attributable to the plaintiff." ■ At the request of plaintiff, the court gave this instruction: "Contributory negligence is the doing of some act by a plaintiff employee amounting to a want of ordinary care for his own safety, that is, the care which a reasonably prudent seaman would exercise under like circumstances." Defendant assigns error. It cannot be gainsaid that the instruction given, standing alone, is inadequate. ■ Contributory negligence may arise from an omission as well as from an act. ■ However, other instructions given cured the defect.[3] When the instructions are read as a whole no error appears.

---

[3] The court gave the following instructions: "You must consider whether or not the plaintiff was negligent, proximately contributing to the happening of the injury."

"The defendant has conceded that the winch driver was guilty of negligence and that such negligence on the part of the winch driver

6. Counsel for plaintiff stipulated during the trial that a sling would be unsafe if it was not properly hooked to the load. Defendant proffered an instruction which was refused to the effect that the jury must accept stipulated facts as conclusively true. It was not error to refuse the instruction. The subject matter was amply covered by an instruction which read: "You shall not consider as evidence any statement of counsel made during the trial, unless such statement was made as an admission or stipulation conceding the existence of a fact or facts." Further, counsel for defendant stated the effect of the requested instruction to the jury in argument.[4]

7. The court, on its own motion, gave the standard instruction defining "the proximate cause of an injury."[5] Defendant assigns error because of the inclusion in the instruction of the phrase "unbroken by any efficient intervening cause," arguing that there was no evidence of any intervening cause and that the effect of the instruction was to confuse the jury. There was no error in giving the instruction. Defendant claimed plaintiff was negligent and that his negligence was the sole proximate cause of the injury. Plaintiff denied any negligence on his part, but as-

was a proximate cause of the injuries sustained by the plaintiff. Therefore, insofar as the question of negligence is concerned, the sole issue submitted to you for decision as a question of fact is whether the plaintiff was also guilty of negligence proximately contributing to his own injury."

"Negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care in the management of one's property or person."

"Negligence is not an absolute term, but a relative one. By this we mean that in deciding whether there was negligence in a given case, the conduct in question must be considered in the light of all the surroundings circumstances, as shown by the evidence."

[4]Counsel said to the jury: "Now, we have stipulated here, and this is important on the question of contributory negligence. A stipulation is an agreement, and conclusively establishes the truth of the fact stipulated to, and the fact cannot be disregarded or ignored by either the court or the jury or by the attorneys. You will recall during my cross-examination of Mr. Fall, and I was going into the question of the sling, 'How do you put them on?' and Mr. Tanner volunteered this: 'I will stipulate with counsel, if that is what he wants to show by reason of these questions, that it would be unsafe if it wasn't properly hooked to the cargo.' And, 'Mr. GALLAGHER: I accept the stipulation.'"

[5]"The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury."

serted that if the jury could infer such negligence, it was not a proximate cause of the injury because the negligence of the winch driver was an intervening cause. These were questions of fact for the jury and the instruction was proper.[6]

8. A unanimous jury awarded plaintiff $65,000 damages. After the jury had been polled, the foreman stated that for the benefit of the attorneys he had a form which gave the conclusions of the jury on the various items of damage. The court at the request of defendant permitted him to read it as follows: "Loss of wages to date, $7,000; For wages lost in the future, $8,000; $50,000 for all pain and suffering heretofore and in the future," and directed the foreman to sign it and ordered it filed. Defendant argues that the time which elapsed from the date of injury to that of rendition of the verdict was about 16½ months; that plaintiff was allowed $425.24 a month for lost wages for that period; that it is clear that the jury used the same formula for "wages lost in the future"; that it is obvious the jury rejected the evidence that plaintiff would not be able in the future to engage in his occupation as an able-bodied seaman, and predicated its verdict on the finding he would be able as soon as his medical treatment was concluded to resume his occupation on a basis of full duty; that therefore, the allowance of $50,000 "for all pain and suffering heretofore and in the future" is so grossly excessive as to shock the conscience at first blush.

The presumptions and rule governing our consideration of the point have been iterated innumerable times and need not be repeated. (4 Cal.Jur.2d 494, § 613.) The presumptions have added strength when the trial judge reviews the verdict on a motion for a new trial and declines to disturb it, as he did in the present case. (4 Cal.Jur.2d 451, § 577.)

Plaintiff was 24 years of age at the time of the accident. He had a life expectancy of 42.12 years. He had been at sea since he was 17, except for one year in the army. Before the accident his earnings were almost $600 a month,

---

[6]The trial judge at the time the question arose correctly stated: "It could be a very logical assumption that if there were any negligence on the part of the plaintiff in attaching the sling, that the force of that negligence had ceased to operate, and that nothing would have happened if the winch driver had been there, and if he had operated the winch properly. If the load had stayed on the deck, nothing would have happened."

take-home pay about $5,200 a year, which would have continued but for the accident. Fifty-two hundred dollars a year for 42 years is $218,400 without considering ever-present opportunities for advancement, as shown by the evidence. The present worth of $5,200 a year for 42 years at 3 per cent interest is $123,247. Plaintiff's left foot was completely avulsed at the ankle joint. Both the tibia (larger of the two bones between knee and ankle) and the fibula (smaller of the two bones) were avulsed through the skin. The foot remained attached by the anterior group of tendons and the posterior tendo Achillis. There was a compound comminuted fracture of the medial and lateral malleolus. The malleolus is the rounded projection of each bone of the leg at the ankle. There were three major and one smaller bone fragments lying in the soft tissue. The leg bones were broken into many small fragments. There was a total dislocation of the foot from the bones of the leg. There was just enough soft tissue left for one large blood vessel to come down. At the time of the accident, the pain was so agonizing that plaintiff was caused to bite a longshoreman who pulled him away from the rails.

Plaintiff was taken to a hospital where he remained nearly three months. The result was complete nonunion. There he was kept under narcotics, opiates, and sedatives; he lost much blood and had numerous transfusions; the wound was granulated, raw, and draining. Six months after the accident a screw was driven into the medial malleolus. The fibula could not be repaired. Later the tibia was fused to the ankle bone destroying the ankle joint. Bone for the fusion was obtained from the hip. During the operation the spinal anesthetic wore off and plaintiff suffered excruciating pain. After the fusion, nonunion of the malleoli remained, resulting in grating of the bone tissue between the ununited malleoli and the tibia and ankle bone. Two months later the conditions previously described persisted, except that there was a partial fusion of the tibia and the ankle bone.

Shortly before the trial plaintiff was fitted with an ankle and foot brace. He used crutches until he was fitted with the brace from which sores developed under his arms causing him trouble and pain. At the time of the trial he was still undergoing treatment. Plaintiff's foot has no eversion or inversion, nor dorsiflexion or plantar flexion. Because there is no motion in the foot he has to walk with his knee stiff so he can get his foot down flat to take the next step;

if he bent his knee he would stub his foot; he cannot walk up steps normally, but must take one step at a time, lifting his foot to a step, then dragging the left one up to the same step and then repeating the process; he cannot rotate his foot in turning and he has lost the ability to balance himself, requiring the use of a cane. The fractures of the medial and lateral malleoli remain ununited. As a result there is constant pain at these fracture sites. Plaintiff has permanent traumatic arthritis in the left foot and ankle and suffers a great deal of pain. If he walks a block the pain increases to the point where he has to lean on someone. If his foot hits a rock or uneven ground he suffers great pain. There is no give in the foot at any time. He suffers from a constant bad burning sensation on the top of the foot through the scarring. He has suffered a permanent nerve injury (severing of the nerve) in the foot. The tendons leading to the toes are involved in adhesions. There is a total loss of function of the muscles of the leg, and no motor supply to the toes and forefoot. To what extent rehabilitation will enable plaintiff to earn a livelihood is left largely in the realm of speculation. There was evidence from which the jury could reasonably conclude that he will never work as a seaman again.

A number of cases in which the verdicts were comparable are set out in the margin.[7] ▉ Where there is no showing of

[7]*Holder* v. *Key System*, 88 Cal.App.2d 925 [200 P.2d 98] ($45,000 award to 51-year-old widow and adult children for death of 56-year-old husband earning $180 a month with life expectancy of 16.7 years); *Correia* v. *Van Camp Sea Food Co.*, 113 Cal.App. 71 [248 P.2d 81] ($42,500 award under Jones Act to mother of 18-year-old seaman earning more than $6,000 a year—parents and son joint life expectancy of 17 years with father gainfully employed); *Sullivan* v. *City & County of San Francisco*, 95 Cal.App.2d 745 [214 P.2d 82] ($100,000—pelvic region crushed and one vertebra fractured); *Gluckstein* v. *Lipsett*, 93 Cal.App.2d 391 [209 P.2d 98] ($115,000—malpractice for raising breasts resulting in disfigurement, constant pain and malignant growths); *Johnston* v. *Long*, 30 Cal.2d 54 [181 P.2d 645] ($73,000—loss of end of nose and numerous operations); *Bisinger* v. *Sacramento Lodge No. 6*, 187 Cal. 578 [203 P. 768] (In 1921—$28,191 for injuries similar to those in case at bar to a woman without earning capacity); *Whittington* v. *Pennsylvania R. Co.*, 55 F.Supp. 1022 ($60,000—loss of earnings $3,000 a year, life expectancy 30 years); *Denny* v. *Montour R. Co.*, 101 F.Supp. 735 ($77,650—R. R. employee 40 years old earning $300 a month painfully crippled and forced to walk in an ungainly fashion); *Southern Pac. Co.* v. *Guthrie*, 9 Cir. 186 F.2d 926, cer. den. 341 U.S. 904 [71 S.Ct. 614, 95 L.Ed. 1343] ($100,000 to 58-year-old man for loss of leg); *Louisville & N. R. Co.* v. *Jolly's Adm'x*, 232 Ky. 702 [23 S.W.2d 564] (In 1930—$5,000 for four days' pain and suffering); *Bimberg* v. *Northern Pac. Ry. Co.*, 217 Minn. 187 [14 N.W.2d 410, 419] (In 1944—$2,060 for 41 hours' suffering); *Stone* v. *Sinclair Refining Co.*, 230 Mich. 472 [202 N.W. 1004] (In 1925—$4,000 for four hours' pain and suffering).

passion or prejudice on the part of the jury in arriving at the amount of the verdict, it cannot be said that the amount is excessive as a matter of law. (*Werkman* v. *Howard Zinc Corp.*, 97 Cal.App.2d 418, 422 [218 P.2d 43].) We cannot say that the amount of damages awarded is so obviously disproportionate to the injuries as to justify the conclusion that the verdict was not the result of the cool and dispassionate discretion of the jury.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.