[Crim. No. 624.   Fourth Dist.   Jan. 5, 1944.]

THE PEOPLE, Respondent, v. EUGENE D. BARBER et al., Appellants.

Martin C. Casey and Raymond E. Hodge for Appellants.

Robert W. Kenny, Attorney General, T. G. Negrich and Eugene M. Elson, Deputies Attorney General, for Respondent.

GRIFFIN, J.—Defendants were charged with the crime of murdering one Leslie Barber. Decedent and defendant Erlene Barber were husband and wife. Defendant Eugene Barber was a brother of decedent. After the trial, the jury returned a verdict of manslaughter against both defendants and recommended leniency. Motions for new trial were denied. The trial court sentenced them to state prisons. They appealed from the judgment and order denying them a new trial.

On June 16, 1943, Leslie Barber, the decedent, and his wife, Erlene, together with a Mr. and Mrs. Jones, started to go on a fishing trip to Big Bear Lake. Leslie induced his brother Eugene to accompany them. The infant child of Leslie and Erlene was left with her mother. Those five persons left in a 1929 Ford two-door sedan automobile. Before leaving San Bernardino they purchased intoxicating liquor. During the ascent of the mountain range they stopped occasionally and imbibed. During the trip nearly all of the driving was done by Mr. Jones, who drank less because of his responsibility in driving the car. His wife also remained more sober than the defendants or decedent. While proceeding up the mountain, someone remarked that defendant Eugene was behind in his drinking and was asked to catch up. When the automobile reached Crestline, more whiskey was purchased and the drinking continued. Then they left Crestline for Big Bear Lake. During the trip up, the defendant Erlene was seated in the rear seat. Her husband was in the front seat. He was teasing her by pulling the hairs on her legs. She was wearing shorts at the time. Later, Leslie got in the back seat with Mrs. Jones and Erlene, leaving Mr. Jones driving, with Eugene in the front seat beside him. There appeared to be no particular ill feeling between Leslie and his wife although he was teasing her. His actions were apparently prompted by a desire to torment her in a friendly manner. However, Eugene remonstrated with Leslie and told him to leave her alone, whereupon the two brothers ceased to be friendly and they became quite angry. They grabbed at each other between the front and back seats until Mrs. Jones became frightened at their antics and demanded that her husband stop the car and let her out. He saw the angry, determined look on Eugene's face, pulled off the highway, and stopped the car.

Mr. Jones testified that at this point both of the Barber brothers "were mad"; that they were still scuffling when he

stopped the car and that Eugene had a hold of Leslie. After stopping the car Mr. Jones pulled Eugene out and Leslie, for some unaccountable reason, started to argue with Mr. Jones, who pleaded with him to avoid trouble.

There is nothing in the record to signify any reason why Leslie should start to quarrel with Mr. Jones. The two boys started to fight. Due to their intoxicated condition they were doing a lot of rolling around on the ground about 20 or 30 feet away from the automobile. Mr. and Mrs. Jones watched them for a while and then Mrs. Jones asked her husband to drive away and leave them, but Mr. Jones protested that that would not be the thing to do. The defendant Erlene interfered, apparently in an effort to avert the fight in the first instance, and to stop it after it started.

It should be here mentioned that before leaving San Bernardino on the trip, Mrs. Jones had put some kitchen knives and other utensils in a paper bag on the floor of the car back of the front seat, intending that they should be used while they were camping. So far as the record shows, none of those knives were ever removed from the paper bag during the trip. Before leaving his home preparatory to the trip, Mr. Jones obtained his hunting knife and took it along. It was contained within a scabbard and was placed on the instrument panel in the front part of the automobile. At that time the knife was examined by defendant Eugene. However, before and during the fight which later ensued, nobody claimed to have seen the hunting knife removed from the instrument board, nor did anyone see any instrument used during the struggle. However, Mr. Jones testified that at Crestline, on the way back, "somebody picked the hunting knife up off the running board of the car and handed it to me as I was fixing to back the car up."

Mr. and Mrs. Jones were the only two persons who testified in reference to the fight that occurred after the car came to a stop. Their testimony may be thus summarized:

Mrs. Jones testified that she and her husband remained near the car during the entire fight; that Eugene and Leslie started fighting; that Erlene "was trying to take them apart and trying to get them to stop fighting"; that she was crying and she put her arms around Leslie and said: "Les., please don't fight; don't have trouble with your brother; he has come to see you, and you have to act like that"; that she was in between them part of the time and was pushing at

both of them with both arms trying to push them away from one another; that she did not know if any blows were struck, but the men were "pushing and wrestling"; that they "would get up and fall down"; that Erlene was begging them not to fight all the time; that she (Mrs. Jones) got in the car and begged her husband to drive on; that she heard Erlene cry out; that at that time they were all up close to the car on its left-hand side; that she heard Erlene say: "Oh, my poor husband, he has been hurt"; that she then looked out of the car and saw "Les, lying on the ground," and Erlene was down on her knees trying to pick up his head; that the defendant Eugene was standing there beside them and doing nothing to help Leslie. She then testified that she went around to them and asked what had happened; that she saw Leslie was "bleeding so terribly"; that she remarked that they would have to get him to a doctor; that Mr. and Mrs. Jones and Erlene put him in the car; that defendant Eugene did not offer to help them; that Erlene sat in the back with her husband's head and shoulders in her lap and his feet across the floor; that defendant Eugene wanted to ride on the running board; that after considerable persuasion he got inside and sat on the right-hand front seat; that they proceeded toward home and stopped at a house where someone told them there was a nurse; that the nurse came to the car, made a superficial examination of Leslie, and it was then that a feminine voice was heard stating that "he was stabbed." Erlene, at that time, said to the nurse: "Look what that brother-in-law of mine did to my husband." The record indicates that the defendant Eugene was present in the front seat and made no response to the statement. Mrs. Jones then testified that they proceeded from there to the hospital in San Bernardino, at which time it was discovered that Leslie was dead.

The witness Mr. Jones testified that when he stopped the car at the scene of the injury, the two men started scuffling and all three started back down the hill about 30 feet from the car where he and his wife remained standing; that Erlene was "just in the scuffle" and that she remarked: "Stop it now, Les"; that at that time the sun was about going down but he could still see; that his wife tried to get him to leave in the car; that a short time later he looked around and Leslie was lying there on the ground bleeding, at a point

about four or five feet from the car; that Erlene was stooping down holding his head and saying: "Oh, my poor husband"; that Eugene was just standing there close by; that they, Mr. and Mrs. Jones and Erlene, helped put Leslie in the car; that Eugene did not assist them; that as they started back Eugene insisted on "hanging on the fender"; that Mrs. Jones inquired of Erlene as to what happened and she replied: "I don't know, Honey," what happened; that Eugene said nothing in response; that later someone picked up the hunting knife off of the "running board" or "the ground" and handed it to him; that he never saw the knife in the possession of either defendant; that on the return home Erlene was crying most of the time.

On the return trip deputy sheriffs intercepted the car and escorted it to the hospital. One deputy testified that at that time Eugene was seated in the back seat; that when they removed Leslie from the car Eugene rendered no assistance; that he was not intoxicated at that time; that Erlene was intoxicated and hysterical; that he searched the car and found the hunting knife on the left front floor board with the sheath on it; that there were no blood stains noticeable.

At the county jail the defendant Eugene was questioned at length and made a statement which was taken down in shorthand and reduced to writing. At the trial Eugene gave a detailed account of his actions up to the time they arrived at Crestline on the way to Big Bear, but testified he did not remember anything from there on until on the return trip he remembered being in the back seat with Erlene holding Leslie in their arms; that he was so intoxicated he did not remember making the detailed statement which he did make at the jail regarding the trip up the mountain.

Erlene testified that she had quite a bit to drink and did not remember anything after leaving Crestline on the trip up; that she faintly remembered having Leslie in her lap on the return trip and that he was "real cold"; that she remembered nothing further until she awakened the next morning in jail.

A post-mortem was performed on the body of Leslie Barber. The autopsy surgeon testified that he was about 25 years of age and 5 ft. 10 inches tall; that an external examination of the body disclosed two wounds resembling incisions; that one was a gaping wound over the right forehead nearly an inch in length, "evidently made by a sharp instrument." One

gaping wound was found on the back of the neck at the base of the skull extending in a horizontal direction, an inch in length and two or three inches in depth, which was made by some sharp-bladed thin instrument, which had severed the right vertebral artery in the spinal column which bled freely and caused his death.

Defendants now contend that the evidence is insufficient to support the verdict and judgment, and that a new trial should have been granted. It is true, as argued by defendant Eugene, that there was no evidence offered to show that the hunting knife contained any signs of blood stains. However, there is no question from the evidence that the mortal wound was caused by a sharp-bladed thin instrument. Whether it was the hunting knife which was on the instrument panel near defendant Eugene that was used is not clear. The failure to find blood on the hunting knife was not determinative of the issue here presented. Most certainly, some sharp-bladed instrument was used, and by someone of sufficient strength to inflict the wound described. Eugene testified that he was a stronger man than decedent. The demeanor of the defendant Eugene while in the car, after they got out, and during the scuffle, indicated that there was considerable hatred displayed between the two men at the time. After scuffling some 30 feet away from the automobile, the two men rolled up near the car, 4 or 5 feet from it, at a point where the hunting knife might have been available to Eugene. The jury no doubt took all of these facts into consideration and it had a right to draw the inference from all the evidence that it was the defendant Eugene who caused his brother's death.

We have carefully examined the entire record as to the evidence that would support a conviction as to the defendant Erlene Barber. We agree with the statement of the attorney general in his brief that "there is in the record no contradiction of the testimony . . . and we think it favors her more than it tends to show any guilt on her part, and the respondent would be unreasonable in undertaking to sustain her conviction. We are guided by a record which provides us with no material which could possibly be used to sustain the verdict against Erlene Barber." It appears to us that the prosecution not only did not show that this particular defendant caused the death of her husband, but on the contrary showed that it was the two brothers who were fighting and that she

was doing everything in her power to prevent the fight. Her actions, from the time of the struggle until they arrived at the hospital, were consistent with innocence.

■ When the evidence relied upon by the prosecution is of such a character as to justify an appellate court in saying that a reasonable mind, uninfluenced by passion or prejudice, could not reach the conclusion of guilt, a question of law is presented which warrants the court in setting the verdict aside. (8 Cal.Jur. p. 591, sec. 583.)

■ Defendant Eugene next complains of errors in reference to instructions to the jury. The court gave, at the request of the prosecution, an instruction on self-defense and justifiable homicide, wherein it was stated that the defendant ". . . would not be justified under the law in taking life unless such taking of life was really or apparently necessary to save *his own,* or to avoid the infliction of great bodily injury *upon him."* It is argued that the defendant Eugene might have been justified in protecting the life of a *third party,* or in avoiding bodily harm to *another person.* Section 197 of the Penal Code pertaining to justifiable homicide *by other persons* was read to the jury. The instruction, as given, sufficiently covered the subject matter.

■ The court refused several of defendant's instructions offered on the question of justifiable homicide and self-defense. Many of them were duplications or repetitions of the contents of the ones given on the subject. The given instructions adequately covered those claimed defenses. ■ It is not error for a court to refuse to give a requested instruction if the subject matter thereof is substantially incorporated in the instructions given. A party is not entitled to have the jury instructed in any particular phraseology and may not complain on the ground that his requested instructions were refused if the court, on its own motion, or otherwise, correctly announced the substance of the law applicable to the case, and this is true even though the requested instructions stated the principles involved more clearly and definitely than those given. (24 Cal.Jur. p. 806, sec. 79.) ■ The defendant Eugene denied having anything to do with the fight. There was no claim by anyone that there was occasion to defend or protect the life of, or avoid great bodily harm to another person. At no time has he suggested any mitigation, justification, or excuse for his actions. He, at all times, denied that he had any hand in the death of Leslie Barber. He should not there-

fore complain of the court's failure to give his particular instruction on self-defense or justifiable homicide. It is our conclusion that he suffered no prejudice in the giving or refusing to give the instructions mentioned. (*People* v. *Wolcott,* 137 Cal.App. 355, 362 [30 P.2d 601].)

Exception is next taken to a ruling of the trial judge involving a portion of some claimed conversation between Eugene and the deputy district attorney while that defendant was confined in the county jail. It involved the question of Eugene's memory on the night of the fatal injury, and had no particular bearing on what took place at the scene of the fracas. We fail to see any prejudice in the ruling of the trial court. There is sufficient evidence to support the inference of guilt as to Eugene D. Barber.

The judgment and order denying a new trial as to the defendant Eugene D. Barber are affirmed. The judgment and order denying a new trial as to defendant Erlene Barber are reversed.

Barnard, P. J., and Marks, J., concurred.