[Civ. No. 14149. First Dist., Div. Two. Apr. 7, 1950.]

THOMAS KNIGHT McNULTY, Respondent, v. SOUTHERN PACIFIC COMPANY et al., Appellants.

A. B. Dunne and Dunne & Dunne for Appellants.

Appel, Dains & Liebermann for Respondent.

GOODELL, J.—This appeal was taken from a judgment entered on a verdict for $100,000 in an action for personal injuries. A motion for new trial was denied.

The plaintiff, a commuter living at Millbrae, was a fare-paying passenger aboard train 106 which left the Third and Townsend depot in San Francisco about 12:31 a. m. on January 17, 1947. The train consisted of the locomotive and tender pulling six cars, the first being "deadheads" or empties, the next two being passenger coaches then in use as such and lighted, and the last car being a "deadhead," unlighted, passenger coach. On that trip Millbrae, plaintiff's destination, was a flag-stop, and before leaving San Francisco the conductor gave the engineer an order to stop there. The stop was admittedly momentary, and shortly after the train pulled out plaintiff was found lying on the Millbrae station platform near the southbound track, with his right leg, severed below the knee, lying on the roadbed between the rails of the southbound track, and his left leg badly mangled but not severed. Blood was on the rails about 6 feet north of the place where he was found. The freight train crew which made the discovery immediately notified police authorities who arrived promptly, gave first aid, and sent for an ambulance. The police chief marked the spot where plaintiff lay, and later made a measurement which became a fixed and determined factor in the case.

None of the five members of the crew of train 106 (engineer, fireman, conductor, and two brakemen) saw plaintiff leave the train, or saw the accident, or knew it had happened until they reached San Jose. Another Millbrae passenger, who was a

witness for plaintiff, knew nothing of the accident until he read of it that evening in the paper. All these facts are without contradiction.

The real issue of fact in this case was as to the manner in which the plaintiff left the train.

Plaintiff testified that he had occupied a seat near the rear of the second lighted coach (the fifth car in the train and the one just ahead of the "deadhead," unlighted, coach) and that as the train slowed down for the Millbrae stop he went to the rear platform of his car and thereafter started to descend the four steps leading therefrom. As he did so he took hold with his right hand of the grab-iron on his right and when the train came to a stop and he reached the lowest step and was about to step with his right foot onto the station platform, the train started up with a "pronounced" jerk which threw him around, disengaged his hold and threw him down between his car and the last car and under the wheels thereof.

The Chief of Police of Millbrae testified that plaintiff was lying disabled on the station platform near the track at a point about 175 feet (a little over two car lengths) northerly from the northerly line of Millbrae Avenue. The five members of the train crew and two other trainmen (who were side-tracked at the station) testified as to the place where the train stopped. There were differences between their estimates, but it may be fairly said that the testimony on appellants' side was that the rear end of the train stopped at about Millbrae Avenue. That avenue crosses the right of way at approximately a right angle, a short distance north of the Millbrae stationhouse.

In his opening statement appellants' counsel told the court and jury ". . . we expect to show you that measuring back, knowing the consist [railroad parlance for the make-up and type of cars] of the train, from the point of this stop . . . that the rear end of that train would have been some place near Millbrae Avenue. And we expect to show you from that that if Mr. McNulty was injured at a point 160 to 175 to 181 feet north of the Millbrae [Avenue] crossing, he could have been injured in only one way, and that is by attempting to get off that train while it was in motion and before it had come to a stop."

This was a frank and definite statement of appellants' position and theory. Respondent contended, on the other hand, that the train necessarily must have stopped with its rear

end near the place where he was found helpless and in shock. The difference, in feet, between the two points, was somewhere around 160, 175, or 181, and this wide disparity presented a broad factual question for the jury. Its verdict implies a finding that the stop was nowhere nearly as far south as any of appellants' witnesses placed it.

Appellants' first contention is that *the verdict was excessive and the result of caprice.*

■ Appellants' brief opens with the statement that "the overshadowing consideration in the case is the amount of the verdict."

At the outset it should be remarked that "Upon appeal, the decision of the trial court and jury on the subject cannot be set aside unless the verdict is 'so plainly and outrageously excessive as to suggest, at the first blush, passion or prejudice or corruption on the part of the jury.'" (*Hale* v. *San Bernardino etc. Co.*, 156 Cal. 713, 715 [106 P. 83], citing cases; followed in *Hicks* v. *Ocean Shore R. R., Inc.*, 18 Cal.2d 773, 785 [117 P.2d 850]). This test, it must be admitted, imposes an extremely heavy burden on an appellant claiming excessive damages.

Respondent's right leg was cut off by the wheels of the train, and he testified that at the time, as he lay helpless on his back, he knew this. It was found on the roadbed between the rails. His left leg was badly mangled but not severed, and at the hospital it had to be amputated 3 inches below the knee. In the same operation the amputation of the right leg was completed 3 inches above the knee.

Plaintiff was 42 years old at the time of the accident, and 43 at the time of trial, with an expectancy of 26 years. His health had been good; he had played golf and some baseball, had done some fishing, and some walking and gardening. He had been with the American Trust Company in San Francisco for over 25 years, since 1921, and held a responsible position as assistant cashier with that banking institution at a monthly salary of $365.

Shortly before the accident he had taken a special training course in the bank to qualify him for a position in one of its suburban branches, which course embraced instruction respecting real estate transactions and practices. In fact on the evening before the accident he had been at a dinner attended by banking and real estate men in connection with this new branch of his activity with the bank.

At the time of the trial he was in the bank's branch at San Bruno.

Respondent's confinement in the hospital after his operations was apparently for a minimum period. His injuries seemed to heal quickly and satisfactorily. On returning to his home he spent some time in bed and was then up and around the house. The train accident gave him a head injury but that seemed to have cleared up without complications or serious difficulties. He suffered from phantom distress and pains common to amputation cases, at times acute, severe and sharp, ''like a toothache.'' He had some difficulty adjusting himself to his two artificial limbs, and in learning to walk and get around with them; he had difficulty in getting up and down steps and inclines.

All in all, respondent's recovery up to the time of trial had been about as satisfactory as could be hoped for, considering the severe injuries he had received and the shock to his system which such serious injuries entailed.

In cases where damages are claimed to be excessive an appellant often points to places in the record where the conduct of the plaintiff, or his counsel, or both, in the presence of the jury has been designed to inflame and excite them and arouse the ''passion and prejudice'' which form the basis of an excessive verdict. This record shows no such conduct, and it is not claimed by appellants that it does. In the courtroom the respondent did not even exhibit the stumps of his legs. There was nothing in his demeanor or conduct, or in that of his counsel, which indicated the slightest attempt to exaggerate or magnify his injuries or suffering. His testimony on that score and otherwise was notably temperate, moderate and dispassionate.

Respondent could prove no loss of earnings since his employer paid him his full salary regularly throughout the eight and a half months of his absence from the bank.

As he adjusted himself to his artificial limbs and could get around, he started back to work for one day a week, then two, and at the time of trial had returned practically to a full week at his desk. His wife drives him to and from his place of business at San Bruno.

His special damages were $2,925.43.

Appellants point to some of the circumstances which fortunately attend this particular case, outlined above, as an argument why such a large verdict is not justified.

The fact remains that respondent, in the very prime of life, must carry on for the remainder of it with this serious handicap. While it is true that his employer took care of him throughout his hospitalization and recuperation with full pay, there is no assurance, in the nature of things, that respondent can continue to hold his present position, or one anywhere nearly as good, with the physical handicap that is his, seriously impairing his ability to get around as an able-bodied man can. As the manager or assistant manager of a branch bank in a community where it is necessary to visit, inspect and appraise property of all kinds and situated in all kinds of places, it is a certainty that respondent will not have the freedom of movement of the ordinary person holding such a position and this, in time, may not only retard his normal advancement with the bank but may jeopardize the position which he now holds. For one thing, he can no longer drive an automobile, and obviously in the performance of his everyday business duties he will need considerable assistance.

In discussing the size of this verdict it must be remembered that "The. appellant's claim that the amount of damages awarded . . . is excessive, concerns an issue which is primarily factual in nature and is not therefore a matter which can be decided upon the basis of the awards made in other cases." (*Crane* v. *Smith*, 23 Cal.2d 288, 302 [144 P.2d 356].)

Despite that, counsel have cited numerous cases showing the sizes of verdicts, and in a case such as this it is hardly possible to exclude such comparisons from the discussion. We shall attempt to confine it to amputation cases, and, with two exceptions to *leg*-amputations.

Always, in such discussion it must be borne in mind also that "The question of what may be reasonable compensation in cases of this kind is a matter on which there legitimately may be a wide difference of opinion." (*Roedder* v. *Rowley*, 28 Cal.2d 820, 823 [172 P.2d 353] ; citing *Bellman* v. *San Francisco H. S. Dist.*, 11 Cal.2d 576, 586 [81 P.2d 894].)

In *Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176 [195 P.2d 427], the plaintiff recovered a verdict for $60,000 for the loss of his left hand. The District Court of Appeal reversed the judgment and ordered a new trial on the sole issue of damages (183 P.2d 105) characterizing the award "as shocking to our sense of justice and one which was rendered under the influence of passion and prejudice." A hearing was granted and the Supreme Court affirmed the judgment. In so doing the court recounted the training and expe-

rience of the plaintiff, but did not go into any detailed computations respecting his loss of earning capacity for the future. It simply said, "The jury was . . . entitled to take into consideration plaintiff's youth, background, and all other relevant circumstances (*Roedder* v. *Rowley*, 28 Cal.2d 820 [172 P.2d 353]) . . ." This, also, was said: "An allowance of damages is primarily a factual matter (*Crane* v. *Smith*, 23 Cal.2d 288 [144 P.2d 356]), and it is well settled that even though the award may seem large to a reviewing court, it will not interfere unless the allowance is so grossly disproportionate to a sum reasonably warranted by the facts as to shock the sense of justice and raise a presumption that it was the result of passion and prejudice. (*Johnston* v. *Long*, 30 Cal.2d 54, 76 [181 P.2d 645].) It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [citations] and the trier of fact should take this factor into consideration in determining the amount of damages necessary to compensate an injured person for the loss sustained as the result of the injuries suffered." The Kircher case is one of the latest decitions of our Supreme Court on the subject of excessive damages.

This court in *Huggans* v. *Southern Pacific Co.*, 92 Cal. App.2d 599, 615-16 [207 P.2d 864], recently had occasion to consider the same subject, and affirmed a judgment on a verdict awarding $91,000 for injuries including the loss of the left leg below the knee and the major portion of the right foot. (Here the respondent lost *his right leg 3 inches above the knee.*)

In that case and in two others in this district (*Gluckstein* v. *Lipsett*, 93 Cal.App.2d 391 [209 P.2d 98], and *Sullivan* v. *City and County of San Francisco*, 95 Cal.App.2d 745 [214 P.2d 82]) applications were made in recent months for hearing by the Supreme Court on the ground of excessive damages but were denied.

Recent cases from other jurisdictions dealing with leg injuries show that some rather large verdicts have been upheld.

In *McKinney* v. *Pittsburgh etc. Co.* (1944), 57 F.Supp. 813, there are several factors corresponding with those found in the case at bar. McKinney was 43, with an expectancy of 26 years, and both legs were amputated midway between ankle and knee. He suffered other injuries but they are not described

in the opinion. The verdict was for $130,000 and on a motion to set it aside as excessive the trial judge suggested a stipulation reducing the verdict to $100,000 and indicated that otherwise he would grant the motion. Presumably this conditional order was followed. The judge said: ''I think that the members of the jury were unduly affected by sympathy. McKinney had a particularly winning and attractive personality and as he crept on his knees past the jury box to the witness stand and climbed upon the witness stand, he was quite an appealing sight.''

As we have pointed out earlier there was nothing of that kind in the instant case.

The injuries were fairly comparable (although there they were less serious than here) ; the plaintiff's age and expectancy were the same in each case and the verdict there, after reduction, the same as here.

In *Affolder* v. *New York etc. Co.*, 79 F.Supp. 365 (Eastern Dist. Mo., 1948) the plaintiff, a switchman, was awarded $95,000 for the loss of his right leg. The amputation left a stump about 4 inches long. The court ordered a remittitur of all in excess of $80,000. That was for one leg.

It should be noted that in both the McKinney and Affolder cases (U. S. Dist. Courts) the reduction was made by the trial judge and not by an appellate court. This is consistent with the rule in this state, namely, that after the jury assesses damages the trial judge is better qualified to act upon the question of a large verdict than is an appellate court. (See *Johnston* v. *Long*, 30 Cal.2d 54, 76 [181 P.2d 645].)

In *Haselden* v. *Atlantic Coast Line R. Co.* (April, 1949), 214 S.C. 410 [53 S.E.2d 60], the court had before it the case, not of an amputation of legs or feet, but a badly smashed and mangled foot. The jury awarded a verdict of $45,000. The Supreme Court of South Carolina rejected the claim of excessive damages and affirmed the judgment.

In *Counts* v. *Thompson* (July, 1949), —— Mo. —— [222 S.W.2d 487], the plaintiff, a railroad man, was awarded a verdict for $165,000 for the loss of both legs above the knees ''removing the lower third of the thigh bones.'' The trial judge reduced this to $140,000, and on appeal the Supreme Court of Missouri ordered a further reduction to $80,000 and affirmed at that figure. But it must be borne in mind that *this was in a jurisdiction where the court said (222 S.W.2d 496) that it did ''not find that a judgment for personal injuries [had] ever been permitted to stand in this state for*

*more than $50,000."* (Emphasis added.) (Compare *Zibbell* v. *Southern Pacific Co.* (1911), 160 Cal. 237 [116 P. 513].)

In *Toledo etc. Co.* v. *Miller*, 108 Ohio St. 388 [140 N.E. 617], plaintiff was awarded $75,000 for the loss of both legs. The accident happened in 1916. On appeal, in 1923, the Supreme Court of Ohio refused to hold that the verdict was excessive. That was *27 years ago.*

The trial court in the case at bar, in denying a motion for new trial, found that the verdict was not excessive (*Johnston* v. *Long, supra,* p. 76) and we have not been convinced that it was.

Appellant contends that the evidence is insufficient to sustain the verdict and judgment against defendants Oster and Tobin.

Oster was the engineer, and appellants concede that if he started the train without a signal, or, upon signal, started it improperly he could be held. One of the principal issues of fact was whether or not he started up with an unusual jerk. Hence there is no difficulty in holding that there was sufficient evidence to align him on the side of responsibility.

Tobin, the conductor, admitted that the general direction and government of the train were vested in himself. Moreover the company's rule, read into evidence, provides that "Both the conductor and the engineer are responsible for the safety of the train and the observance of the rules, and, under conditions not provided for by the rules, must take every precaution for protection. This does not relieve other employees of their responsibility under the rules."

Rule 843 reads: "The general direction and government of a train is vested in the conductor, and all other persons employed on the train will obey his instructions. Should there be any doubt as to authority or safety of proceeding he will consult the engineer, who will be responsible with him for the safety and the proper handling of the train and such use of signals and other precautions as circumstances may require . . ."

Another rule, 846, reads: "The protection of trains is of the first importance, and conductors must not allow other duties to interfere therewith. They must require their flagman to act with the utmost promptness and in strict accordance with the rules. A trainman must be stationed, when practicable, on the rear of every train while in motion."

It appeared in evidence that another rule required the

rear-end brakeman to take a position at least 30 feet in back of the rear end of the train whenever it came to a stop, and that in this Millbrae stop—because of the brevity thereof—that was not done. This, alone, would seem to involve the conductor in liability in view of the language of rule 843 fixing the conductor with responsibility for enforcing all operating rules.

The rule requiring of carriers the utmost degree of care of course applies with equal force to the carrier's employees and agents, since it is only by and through these human agencies that a corporate carrier can operate. Incidentally, an instruction tendered by defendants told the jury in so many words that "A corporation can act only through its servants, agents and employees . . ."

We are satisfied that, although the conductor was on the train and not on the ground when the accident occurred, there was sufficient evidence to fasten liability on him as well as on the engineer.

The complaint predicated negligence not only on the alleged violent jerk of the train but also on the company's failure "to supply and maintain sufficient and adequate lighting facilities in and about said station . . ." It is argued that such failure, if any, would not be attributable to either the conductor or the engineer. That may be conceded, but still the plaintiff's recovery was not restricted to the latter of the two grounds. This is discussed later.

In presenting their next point,—that there was insufficient evidence to sustain the verdict and judgment against the company—appellants say "It is a commonplace,—one on which the court instructed,—that a corporation can act only through human beings. If the human beings it has engaged to carry out its activities are free from negligence, it, equally, is free from negligence." That rule, of course, works both ways and the negligence once found, of either the conductor or the engineer, or both, would be the company's negligence.

Fifty-three pages of appellants' briefs are devoted to a series of lengthy and detailed attacks respecting instructions, most of which we think are extremely technical. Before discussing them it should be said that a reading of the charge as a whole, just as it was delivered to the jury, shows a singularly fair and well-balanced set of instructions. It would appear that more instructions were given at appellants' request than at respondent's, although this cannot be said definitely.

Appellants complain, first, that the court twice told

the jury that the plaintiff was suing for $250,000, thus it is argued, carrying to the jury a clear implication that it could return a verdict up to that amount. The jury was told that it could ". . . assess the amount of damages . . . *but not to exceed the sum of $250,000.*" (Emphasis added.)

"An instruction of this character is usually given in negligence cases, and it is difficult to understand how a jury in such cases can be properly instructed by the court without employing language similar to that used by the court in the instruction complained of. There could be no error, therefore, in so instructing the jury . . ." That is not *our* language. It was used by the Supreme Court in the case of *Lahti* v. *McMenamin,* 204 Cal. 415, 421 [268 P. 644], where a similarly worded instruction was given, and it would seem to settle the matter. Other cases to the same effect are *Ellis* v. *Central California Traction Co.,* 37 Cal.App. 390, 403 [174 P. 407]; *Ritzman* v. *Mills,* 102 Cal.App. 464, 468-72 [283 P. 88]; *Johnson* v. *Pickwick Stages System,* 108 Cal.App. 279, 286 [291 P. 611]; *Kleem* v. *Chapot,* 112 Cal.App. 553, 556-7 [297 P. 574]; *Machado* v. *Harm,* 112 Cal.App. 748, 754-5 [297 P. 626]; *Parsell* v. *San Diego etc. Co.,* 46 Cal.App.2d 212, 215-16 [115 P.2d 539]; *Buswell* v. *City & County of San Francisco,* 89 Cal.App.2d 123, 134 [200 P.2d 115].

Moreover, numerous instructions were given on the subject of damages, so phrased as to give the jury the true elements for their consideration, and to warn them against speculation, emotion, sympathy, passion or prejudice.

Error is claimed in the court's refusal to instruct the jury that "There is no evidence in this case that there was any negligence or carelessness on the part of defendant Southern Pacific Company in supplying and maintaining sufficient and adequate lighting facilities at the point of accident . . .''

The complaint alleged that "defendants negligently and carelessly operated said train so as to cause it to violently jerk and move forward thereby precipitating plaintiff off of said car." It also alleged that "At said time it was dark and defendant, Southern Pacific Company, negligently and carelessly failed to supply and maintain sufficient and adequate lighting facilities in and about said station and the area immediately adjacent thereto so as to enable passengers alighting from its trains at night to discern the place where said train stopped."

Thus two separate and independent charges of negligence were contained in the same count.

The legal question was exactly the same as that presented in *Criss* v. *Angelus Hospital Assn.*, 13 Cal.App.2d 412, 415 [56 P.2d 1274], a malpractice case, where four distinct types of negligence were charged in one count, one of them being "Admitting plaintiff's wife to the hospital." There was no evidence which would sustain a finding on that score, and the defendants requested an instruction telling the jury so. The refusal was assigned as prejudicial error. It was held to be harmless, but not prejudicial, error.

That the plaintiff himself did not consider that a sufficient showing had been made respecting the lighting condition is indicated by his failure to propose any instruction on that subject. The instruction withdrawing that issue should have been given, but we are satisfied, for the reasons and on the authorities found in the Criss case, *supra,* at page 415, that the failure to give it was not prejudicial error.

The situation falls squarely within the rule that ". . . a plaintiff may rely upon any one of the alleged acts of negligence as the proximate cause of his injury . . . Accordingly, where several acts are pleaded, a general verdict for the plaintiff will not be set aside for want of evidence to support it if there is sufficient evidence of negligence to justify it upon one of the issues . . ." (19 Cal.Jur. p. 675.) Hence the error in refusing to remove the lighting issue from the case in no way vitiated the general verdict. Cases following the Criss case are *Parker* v. *Manchester Hotel Co.*, 29 Cal.App.2d 446, 448 [85 P.2d 152], and *King* v. *Schumacher,* 32 Cal.App.2d 172, 180 [89 P.2d 466]. An earlier case to the same effect is *Big Three M. & M. Co.* v. *Hamilton,* 157 Cal. 130, 141 [107 P. 301, 137 Am.St.Rep. 118]. See, also, *Hume* v. *Fresno Irr. Dist.,* 21 Cal.App.2d 348, 356-7 [69 P.2d 483]; *Shields* v. *Oxnard Harbor Dist.,* 46 Cal.App.2d 477, 491 [116 P.2d 121].

█ In the instances about to be reviewed the court is criticized for refusing to give instructions proposed by appellants on various subjects. It may be conceded for the purpose of the discussion that in some of those instances appellants' proposed instructions contained a statement of the law with more clarity than the instructions which were given. (See *Mullanix* v. *Basich,* 67 Cal.App.2d 675, 680 [155 P.2d 130].) That, in itself, would not be a good reason for holding the refusal to be error. "The burden cast upon the party claiming error is not only to show it, but also to show that such error is

sufficiently prejudicial to justify a reversal.'' (*Mullanix* v. *Basich, supra,* citing *Coleman* v. *Farwell,* 206 Cal. 740 [276 P. 335].)

''Numerous cases establish the rule that it is not error for a court to refuse to give a requested instruction if the subject matter thereof is substantially incorporated in the instructions given. A party is not entitled to have the jury instructed in any particular phraseology, and may not complain on the ground that his requested instructions are refused if the court, of its own motion or otherwise, correctly announces the substance of the law applicable to the case; this is true even though the requested charges state the principles involved more clearly and definitely than those given'' (24 Cal.Jur. pp. 806-810). Late cases to the same effect are *Burke* v. *Marshall, Inc.,* 42 Cal.App.2d 195, 204 [108 P.2d 738]; *People* v. *Barber,* 62 Cal.App.2d 206, 213 [144 P.2d 371]; *Huston* v. *Schohr,* 63 Cal.App.2d 267, 277 [146 P.2d 730]; *Luis* v. *Cavin,* 88 Cal. App.2d 107, 115 [198 P.2d 563]. In *Chandler* v. *Benafel,* 3 Cal.App.2d 368, 371 [39 P.2d 890], it is said: ''. . . It is not the rule that merely because an instruction may be said to be applicable to the case *from the viewpoint of the party offering it,* that the court by reason thereof is required to give it.'' (Emphasis added.)

Appellants claim the court erred in refusing an instruction reading: ''If you should return a verdict for plaintiff it will be improper to attempt to measure the amount of an award, if any, by attempting to put yourselves in plaintiff's place, or by asking yourselves what sum you would take to make such an exchange of places . . .'' No authority is cited, and we know of none, holding erroneous the failure to give such an instruction.

Appellants next claim that the court erred in charging that the company ''was bound to provide vehicles safe and fit for the purposes to which they are put and is not excused for default in this respect by any degree of care.'' The theory of respondent was that there was a violent jerk in the operation of the train. One of appellants' witnesses testified that it is not normal for a train to start with a jerk, and respondent points out that either the engineer was negligent in operating the train *or that something was wrong with the equipment.* It would seem to follow that the instruction was proper. No authority is cited to the contrary. Each side was entitled to instructions on its theory of the case, and the possibility that

856

defective equipment caused the accident was certainly within the range of plaintiff's theory.

The engineer testified on direct examination that attached to his locomotive was a mechanism known as a "booster engine" which was "used solely in starting a train, in order to give it additional power at the start," and the operation of which "makes a much smoother start. It allows you to use more power in starting."

■ Appellants complain that the court in instructing on contributory negligence failed to lay enough stress on the fact "that in making out their defense of contributory negligence, the defendants were entitled to rely on plaintiff's showing."

In the instruction which was refused the thought was emphasized that contributory negligence might appear as well from "evidence introduced on the plaintiff's case" as from that introduced by the defense, the quoted words being used thrice therein.

The court gave the usual stock instruction concluding with the sentence "Unless it is shown by or may be inferred from, *the evidence offered by plaintiff*, such negligence is a matter of defense, to be proved affirmatively by defendants" (emphasis added).

In addition thereto the court gave several other instructions on contributory negligence which informed the jury of *the plaintiff's duties and obligations as a passenger*, and of defendants' right to assume and presume that such duties and obligations would be met.

This particular assignment of error is peculiarly subject to the holding in *Chandler* v. *Benafel, supra,* that ". . . It is not the rule that merely because an instruction may be said to be applicable to the case *from the viewpoint of the party offering it,* that the court by reason thereof is required to give it."

■ Appellants argue that, unlike a case where the witness to an occurrence has died, the plaintiff here was able to, and did, testify as to just what he did in alighting from the train, hence they claim that the following instruction should have been refused: "In the absence of evidence to the contrary, the law presumes that . . . the plaintiff . . . did everything at the time of and immediately prior to the occurrence in question that a reasonably prudent person would have done under the circumstances for his own protection and safety."

However, the following instruction would seem to have balanced it off: "It is sometimes said that there is a presump-

tion that a person injured in an accident exercised ordinary care for his own safety. You are instructed that *such a presumption cannot stand in the face of testimony which overcomes it. If the presumption has been overcome by testimony it passes out of the case.''* (Emphasis added.)

The jury were also instructed that there is a presumption that a *defendant* exercised due care, and that *the plaintiff must prove the contrary*; also that *no inference or presumption of negligence of defendants arises from the mere fact of injury.*

Thus the jury were given the presumptions attending both sides.

As was said in *Tuttle* v. *Crawford*, 8 Cal.2d 126, 133 [63 P.2d 1128], ''The presumption is a natural one, and the bare code section, as given by the court, told the jury nothing that the philosophy of life and human experience do not impart to the average person.''

The cases cited in *Martindale* v. *Atchison T. & S. F. Ry. Co.*, 89 Cal.App.2d 400, 412 [201 P.2d 48], (including *Tuttle* v. *Crawford*) hold that the giving of this instruction is not prejudicial error.

■ Appellants attack several instructions on the degree of care owing by a carrier to its passenger. One of these instructions told the jury that the carrier was duty bound to avoid inflicting injury upon passengers ''particularly when such persons are in the act of alighting from such train.'' The word ''particularly'' should not have been used, but we are satisfied that such emphasis as it gave was neutralized by other instructions which told the jury that the carrier had to permit the passengers ''a reasonable opportunity to alight at their destinations, and is required to exercise to that end a reasonable degree of skill.'' And, further, ''You are not to understand from this that the railroad company is an insurer of the passengers' safety in alighting from the train, because it is not an insurer of their safety in alighting from the train.''

Appellants argue that the carrier's duty is not, as the jury was told, to allow the plaintiff ''a reasonable time to alight'' but only to exercise proper care to that end.

An instruction was given that ''It was likewise the duty of the employees of the Southern Pacific Company not to start or move the train while Mr. McNulty, or anyone else, was in the act of alighting therefrom until such alighting passenger was safely on the station platform and clear of the train.''

No authority is cited to show that these instructions were erroneous, and we consider the criticism technical.

The criticism which appellants make of the res ipsa loquitur instructions is answered simply by pointing to other instructions given on the same subject, and particularly to the following:

(1) "If when the plaintiff McNulty went under the train and he was in the act of alighting from the train, he was himself in motion and his own voluntary movements proximately contributed to his being injured there is no room in this case for the application of the so-called doctrine res ipsa loquitur and the fact of accident and injury raises no presumption and is no ground for any inference of negligence on the part of any defendant, and if there is no other evidence of negligence on the part of defendants your verdict must be in favor of defendants."

(2) "No inference or presumption of negligence on the part of defendant or its employees arises from the mere fact that the plaintiff was injured when alighting from the train of defendant Southern Pacific Company."

(3) "Reference has been made to the doctrine of res ipsa loquitur. Even where this doctrine applies, it does not shift the burden of proof on the issue of whether or not defendants were negligent. The only effect of that doctrine, where it applies, is to impose on the defendants the burden of going forward with the evidence, and where the defendants have done so, and their evidence affords explanation of how the accident happened, from which it appears defendants were not negligent, the defendants have satisfied the burden under the doctrine and then, under that doctrine it still remains, after all of the evidence is in, in such circumstances, that the burden of proof has not shifted and the burden of proof is still upon the plaintiff on the issues of defendants' negligence. If, on the whole case, the plaintiff has not sustained this burden, your verdict must be in favor of the defendants."

Finally, appellants contend that the court erred in sustaining objections to questions put to plaintiff which were designed to develop that he had on past occasions jumped from moving trains or that it was his habit to do so. It is difficult to see how the rejection of such evidence could have been prejudicial error.

We are satisfied that although there were a few instances

of harmless error in this record there was none of a serious or prejudicial nature. The instructions, as we have said before, were fair and well balanced.

The judgment and order appealed from are affirmed.

Nourse, P. J., and Dooling, J., concurred.

The opinion was modified to read as above and a petition for rehearing was denied May 6, 1950, and appellants' petition for a hearing by the Supreme Court was denied June 1, 1950.