[Civ. No. 18977. Second Dist., Div. One. Sept. 12, 1952.]

ANNA S. CORREIA, as Special Administratrix, etc., Respondent, v. VAN CAMP SEA FOOD COMPANY, INC. (a Corporation) et al., Appellants.

Lasher B. Gallagher for Appellants.

Ekdale, Shallenberger & Toner, Arch E. Ekdale, Gordon P. Shallenberger and George E. Toner for Respondent.

WHITE, P. J.—Plaintiff as administratrix of the estate of her deceased son, Joseph Edward Correia, brought an action for damages by reason of his death which occurred in the course of his employment as the member of a crew of the

fishing boat "Sea Hound," a tuna clipper operated out of the port of San Diego, California. The vessel was of United States registry, wholly owned by the defendants, citizens of the United States. The action was brought for the benefit of the surviving parents of the deceased, pursuant to the provisions of the Jones Act (46 U.S. Code, § 688). The jury awarded plaintiff damages in the sum of $42,500 and from the judgment on such verdict the present appeal is prosecuted.

At the time of the incidents which resulted in the death of decedent, the "Sea Hound" was operating in the vicinity of the Galapagos Islands off the coast of Ecuador. In the operation of seining for live bait, it was frequently necessary, and a regular custom, to send a member of the crew overboard, equipped with a diving helmet, for the purpose of freeing the seine or bait net when it became entangled or snagged on the bottom of the sea, the bottom in this area consisting of rough, uneven lava and coral rock, with many crevices, depressions or craters ranging from 15 to 20 feet in depth. It was while so diving that the decedent met his death by drowning.

It was charged in the complaint that the defendants negligently failed to supply and maintain the vessel, her equipment, fixtures and tackle, in a fit and seaworthy condition, negligently failed to equip the vessel with suitable appliances, and negligently failed to provide the decedent with a safe place to work in that they failed to provide competent personnel to man the air pumps used in diving and to man the other diving equipment which the decedent was compelled to use, and negligently failed to provide an adequate or any means of communication between the surface and the said decedent while he was engaged in diving, and negligently failed to provide a competent lookout or any lookout to watch for the safety of the decedent while he was engaged in diving.

The Jones Act provides that the personal representative of any seaman who shall suffer death by reason of personal injury may maintain an action for damages at law. In an action such as the one now before us, the Jones Act provides that "all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable." The Federal Employers' Liability Act (45 U.S. Code, §§ 51-60) provides that recovery may be had for death resulting in whole or in part from the negligence of any of the officers, agents or employees of such

carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, road bed, works, boats, wharves, or other equipment.

Appellants contend that the superior court was without jurisdiction of plaintiff's asserted cause of action for the reason that the death of decedent occurred without the territorial limits of the United States. They place great reliance upon the case of *New York Central R. Co.* v. *Chisholm,* 268 U.S. 29 [45 S.Ct. 402, 69 L.Ed. 828, 832], wherein it was held that the administrator of the estate of an employee of the New York Central Railroad Company operating between New York and Montreal, Canada, who suffered fatal injuries during the course of his employment, at a point some thirty miles north of the international line, did not have a cause of action based upon the Federal Employers' Liability Act. In the case just cited the court held that "The carrier was subject only to such obligations as were imposed by the laws and statutes of the country where the alleged act of negligence occurred; and the administrator could not rely upon any others."

We are persuaded that the Jones Act gives a right of recovery to the seaman as such, and that jurisdiction over a suit filed thereunder does not depend upon the place where the injury is sustained but on the relation of the seaman's service to the operation of the vessel plying navigable waters. As was said in *Taylor* v. *Atlantic Maritime Co.,* 179 F.2d 597, 599, with reference to the case of *New York Central R. Co.* v. *Chisholm, supra,* so strongly relied upon by appellants, "However, the value as a precedent of this decision of the Supreme Court in actions under the Jones Act was at best gravely impaired by *Cortes* v. *Baltimore Insular Line.*" (287 U.S. 367 [53 S.Ct. 173, 77 L.Ed. 368].) The substance of the decision in the case just cited was in the following passage: "We do not read the act . . . (for the relief of seamen) as expressing the will of Congress that only the same defaults imposing liability upon carriers by rail shall impose a liability upon carriers by water." And it was further said in the case of *Taylor* v. *Atlantic Maritime Co., supra,* page 598, "The Jones Act gives to an injured seaman an 'action' in which 'all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.' Under the ordinary convention, if a seaman is injured on the high seas, his rights are the same as though he had been injured

within the country of the ship's flag; . . . When a seaman signs articles in a foreign port for service on an American ship, and is injured on the high seas, there is no embarrassment, whether one regards the claim as sounding in tort, or in contract. So far as it sounds in tort, it depends upon American law—the law of the flag—; so far as it sounds in contract, although the law of the place where the contract is made will ordinarily apply, it is a well-recognized exception that in all that concerns the 'internal economy' of the ship the law of the flag controls.'' (See, also, *Cain* v. *Alpha S.S. Corp.*, 35 F.2d 717, 718.)

Also in the case just quoted from, in commenting further on the case of *Cortes* v. *Baltimore Insular Line, supra,* the court said at page 600 [179 F.2d], ''. . . but it does establish beyond question that the Railway Act is not to be taken as a rigid pattern for all rights granted by the Jones Act.''

The conditions at sea differ widely from those on land and the diversity of conditions breeds diversity of duties. We are convinced that the weight of authority supports us in saying that in actions of the kind now engaging our attention, before we abrogate the age-old maritime principle that the law of the flag controls in such matters we must find a more definite expression of that purpose by the legislative branch of the government.

Appellants next urge that the evidence is insufficient to support the implied finding of the jury that they were guilty of actionable negligence.

In this regard appellants assert that before actionable liability may be fastened upon them the following factual bases must exist:

(1) The death must result in whole or in part from the personal negligence of one or more of the officers of the corporate defendant or one or more of the other agents or employees of the employer of a seaman; or

(2) By reason of some defect or insufficiency, due to the negligence of the employer of such seaman, in its or his (as the case may be) appliances, machinery, boats or other equipment.

■ With reference to the second possible factual basis of liability, appellants insist that it refers *exclusively to the physical property* of the employer used in and about the course of the employment of the seaman. With this contention we cannot agree. In an action prosecuted under the Federal Employers' Liability Act it has been held that the terms ''sufficiency'' and ''defect'' are not restricted to physi-

cal property, but that the term "sufficiency" applies to the amount of help assigned to do a particular job and to the duty resting upon the employer to furnish his employee reasonably sufficient help (*Cheffey* v. *Pennsylvania Ry. Co.*, 79 F.Supp. 252, 258). And, under the Jones Act the cases are uniform in holding that in making preparations for a voyage the owners of a vessel are under a duty to provide a vessel manned with a sufficient crew and at all times to see to the safety of the crew (*Koehler* v. *Presque-Isle Transp. Co.*, 141 F.2d 490, 491; *"The Rolph,"* 299 F. 52, 55; *Texas Co.* v. *N.L.R.B.*, 120 F.2d 186, 189). A breach of such duty is therefore negligence and actionable under the Jones Act. Liability is not limited to negligence of the employer of a seaman in its or his appliances, machinery, boats or other equipment.

In support of their contentions that the evidence was insufficient to support the verdict, appellants contend there was no evidence showing that the "Sea Hound" was not equipped with proper emergency rope. However, assuming the vessel was equipped with proper rope, there is evidence that the agents and employees of appellants did not use any rope in conducting the diving. If any rope was aboard it was not supplied to aid in the diving operations.

While conceding "for the purpose of argument only" that the stoppage of the air pump supplying air to Correia, the diver, was negligence, appellants excuse such stoppage with the statement that it was but momentary. The answer to this is that there is substantial evidence to support a finding that the stoppage of the pump continued for a matter of several minutes. It was for the jury to determine whether the pumps stopped for seconds or minutes.

Appellants urge that there is no evidence showing that "this short stopping" of the pump proximately caused or proximately contributed to the death of Joseph Correia. Respondent's answer to this claim is thus stated in her brief: "Attention is invited to the type of equipment used which supplied barely enough air for the diver to survive; therefore, any stoppage would be dangerous, for it would increase the carbon dioxide concentration, and even a slight concentration of carbon dioxide (3%) will induce panic, and increased breathing, which in turn increases further the amount of carbon dioxide. Very little carbon dioxide renders a man unconscious. Is it difficult to reason that an unconscious man in the type of equipment used, could stumble, or fall,

and lose his helmet in a matter of a second, let alone several seconds or minutes? If he did lose his helmet, while unconscious, it is obvious that he would drown." Appellants' deduction is not the only reasonable inference to be drawn from their premise.

It is urged by appellants that the evidence shows that very frequently shallow water divers remove the helmet and swim to the surface. That in the case at bar, the testimony shows that the decedent sustained a cut on the top of his head. That this cut could only be caused by coming in contact with some hard object. That the reasonable inference is that Joseph Correia had removed his helmet and was attempting to come to the surface when he bumped his head on some hard object thereby causing him to become unconscious. Again, this is not the only reasonable inference deducible. It is conceded that Joseph Correia donned the helmet and descended. It could reasonably be inferred that after the stoppage of the pumps he became unconscious while still in the helmet, that he had lost consciousness through a fall or striking his head. As to the abrasion on Correia's head there is of course no direct evidence as to how the same was caused. But it is equally reasonable to assume that he received it during the rescue attempts or after becoming unconscious as to assume that he received it in the manner urged by appellants.

And if we adopt appellants' theory we are still confronted with the fact that the decedent would not have been required to slip the helmet and rise to the surface had the pumping been carried on in an approved and generally recognized proper manner, with proper signals, proper lines and someone assigned to the air line to receive the diver's signals. If he became unconscious and drowned because of these latter conditions, manifestly his demise was attributable to appellants' negligence.

While conceding there was considerable testimony with reference to the method of signalling between a diver and persons on the surface, appellants urge that respondent offered no evidence of any kind with reference to the signals that may have been discussed and agreed upon by Joseph Correia before he made his dive. We fail to perceive the force of this argument because the evidence is uncontroverted that no one was assigned or present to receive signals. And as respondent states, "However, we have every reason to believe that on the one or two occasions when someone did think to

go over to see if there were any signals, that the signals were the same as those used with the other diver, whose testimony we have. Respondent again states that the testimony of every witness who could be secured by respondent was given; therefore, the respondent, and we think, the Court, *must* assume that the other witnesses referred to by Appellants would not have testified any differently, otherwise, Appellants would have produced them (said witnesses, if they existed, being their employees). In any event, from all of the evidence, it appears that the signals used generally in this operation were improper to protect the safety of the divers, and that a reasonably prudent employer or person in charge of such operation should have known that! The signals do not even provide that degree of safety found in signals used on other boats in the fleet. Most of them had signals for more air, and some for emergencies (citing reporter's transcript references)."

Appellants urge that the pump operations or lack of them as well as the question of signals and when and why Joseph Correia got out of the helmet are left entirely in the realm of speculation and surmise.

It is not disputed that liability of a ship owner under the Jones Act is predicated on negligence and that the burden of proving such negligence rests on the plaintiff. The sufficiency of the evidence to support a verdict in a case such as the one at bar is a question of substantive law as interpreted by the federal courts. As pointed out in the case of *Showalter* v. *Western Pacific Ry. Co.*, 16 Cal.2d 460, 471 [106 P.2d 895], relied upon by appellants: "Likewise, it is clear under the federal decisions as under the decisions of this state that no mere scintilla of evidence but substantial evidence must be produced by the plaintiff in order to sustain the burden of proof. (*Pennsylvania R. Co.* v. *Chamberlain,* 288 U.S. 333 [53 S.Ct. 391, 77 L.Ed. 819] ; *Small Co.* v. *Lamborn & Co.,* 267 U.S. 248 [45 S.Ct. 300, 69 L.Ed. 597] ; *Gunning* v. *Cooley,* 281 U.S. 90 [50 S.Ct. 231, 74 L.Ed. 720] ; *Southern Ry. Co.* v. *Walters,* 284 U.S. 190 [52 S.Ct. 58, 76 L.Ed. 239] ; *Chicago G. W. R. Co.* v. *Rambo,* 298 U.S. 99 [56 S.Ct. 693, 80 L.Ed. 1066].) The evidence produced to show that negligence on the part of the carrier was the proximate cause of the accident may be either direct or circumstantial, but it must be *substantial.* Evidence which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient. (Citing cases.)" Let us there-

fore look to the federal cases for a yardstick to measure what is mere speculation or conjecture and what amounts to substantial proof. In *Lavender* v. *Kurn*, 327 U.S. 645 [66 S.Ct. 740, 90 L.Ed. 916, 923], the rule is stated as follows: "It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. *Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear.* But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (Emphasis added.) (See, also, *Tennant* v. *Peoria & P. U. R. Co.*, 321 U.S. 29 [64 S.Ct. 409, 88 L.Ed. 520, 524, 525].)

We are persuaded in the instant case that there is not a complete absence of probative facts to support the conclusion arrived at by the jury that the negligent omissions of appellants proximately contributed to the death of Joseph Correia.

█ Where a plaintiff has proven sufficient facts to justify a verdict on one theory, the fact that there may be one or more other seemingly rational explanations of the evidence does not preclude a recovery or invalidate the verdict. These are mere matters of argument to be presented to the jury.

█ When the inferences which may be drawn from the evidence to sustain the verdict are reasonable the appellate tribunal's function is exhausted, and the fact that the latter court might draw a contrary inference or feel that another conclusion is more reasonable becomes immaterial.

█ Appellants contend that none of the persons in the skiff, three in number, who could have been negligent insofar as Joseph Correia was concerned, were called by either side. It is urged that it must be presumed that each of these men was innocent of wrong (Code Civ. Proc., § 1963, subd. 1) and that there is no evidence to controvert such presumption or support a finding that any of these three men did or failed to do anything which proximately caused the death of Joseph Correia. But, as pointed out by respondent, to sustain such contentions would be to ignore the fact that the master

of the vessel (who was present in the skiff), and who did testify by deposition, admittedly did not assign anyone to the duty of tending the air line for Joseph Correia for the purpose of giving and receiving signals. And, as further pointed out by respondent, "It ignores entirely the fact that none of the witnesses who were called heard any such assignments given by the Master, or by anyone, including David Ghio. It completely ignores the testimony that no one observed anyone regularly tending Correia's air line, and further disregards the admitted fact that William Perry stopped pumping air to Correia. It misses the fact that steady streams of bubbles were seen for some time prior to the discovery that Joseph Edward Correia was not in his helmet. No one investigated to see if there was anything wrong, although it was common knowledge that when a diver is working, bubbles come up in bursts, and not in a steady stream, although this presupposes someone is interested enough to look, an unsafe supposition in a venture such as was conducted by the Appellants. Frank Gonsalves, who apparently, from the testimony, had taken it upon himself to now and then check Correia's air hose to see if there were signals, did so only cursorily and at infrequent intervals and if, as the evidence indicates, he was the one who assumed that duty, then he was negligent in the manner in which the Master says that duty was performed. To indulge in the presumption called for by the Appellants ignores the chaos and confusion which attended the attempts at recovering Correia's body, and at a time when he may well have been alive. The testimony is uncontradicted that no one directed the rescue, although the Master and the Bait Boss, David Ghio, were both aboard the skiff, and doing nothing else at the time. The failure and omissions attendant on the rescue attempts in and of themselves insured Joseph Edward Correia's death if he had not already become a victim of the other failures, omissions and acts of negligence."

We are persuaded that to hold there was no negligence reasonably established, nor proximate causal connection between such negligence and the death of the seaman Joseph Correia would amount to unwarranted substitution of the judgment of this court for that of the duly established arbiter of the facts.

The next contention of appellants is that the evidence is insufficient to support the implied finding of the jury that neither Joseph Correia nor his father was negligent.

■ In the consideration of this claim it should be borne in mind that in an action under the Jones Act, negligence of the deceased or his father does not bar a recovery but is received only in mitigation of damages (U. S. Code, title 45, § 53).

■ In support of the claimed negligence of Joseph Correia and his father, appellants assert that the evidence shows that Joseph Correia's father was in a position where he could observe everything that was being done up to and including the time of the discovery of the empty helmet. That both the father and son knew that the dive was being attempted without any separate life lines being attached to Joseph Correia. That Joseph Correia was not ordered or requested to make the dive. That he engaged in an argument with Frank Gonsalves and insisted upon making the dive with the equipment which was then and there available. That if this equipment was not sufficient and if such insufficiency of equipment proximately caused or proximately contributed to his death then Joseph Correia was clearly guilty of contributory negligence.

"And further that the evidence shows without conflict that Joseph Correia did leave the helmet. The evidence also shows that a man with an ordinary face would have to hold the helmet in place and deliberately turn his head to one side or the other in order to get out of the helmet. Therefore it is a reasonable inference that the act of leaving the helmet was a deliberate act on the part of Joseph Correia.

"The plaintiff may contend that permitting Joseph Correia to make the dive without the use of a rope life line was an act of negligence. If that contention is made, it must follow that Joseph Correia and his father were also guilty of negligence. They and each of them knew that there was no such rope.".

In making the dive the seaman was performing an act within the course of his employment and the fact that he volunteered to perform such duty cannot therefore be characterized as negligence. With reference to the insufficiency of the equipment used by the seaman, there is no evidence that he knew of the necessity for an emergency line. He was not a ship's officer upon whom devolved the duty of supplying sufficient equipment.

With reference to the claim that the decedent negligently left the helmet, we have already discussed that matter in connection with the other equally reasonable hypothesis that the helmet was pulled from his head or that it became neces-

sary to abandon it. At the trial it was demonstrated that it was not necessary to turn the head from one side to the other in order to remove the helmet; that it could have been pulled off or could have come off if Joseph Correia, for lack of air or other cause became unconscious and fell.

With reference to appellants' claim that the decedent's father was negligent because he saw his son about to dive and should have stopped him, we fail to perceive by what authority the father, who was not a ship's officer, could order his son not to undertake the dive. Appellants fail to explain how the father who was some 50 feet away in another boat performing other duties, could have intervened after his son had donned the helmet. Furthermore, we cannot determine whether the jury found negligence on the part of the father and son or either of them, because such a finding would go only to mitigation of damages. No special interrogatories were propounded to the jury nor was a special verdict requested. The jury may have found negligence and if so, we must assume such finding was taken into consideration in arriving at the amount of the damages assessed.

Appellants next attack the award of damages in the sum of $42,500 as being excessive and without support in the evidence. In this regard, appellants state that "There is not a scintilla of evidence in the record showing that either the father or mother of Joseph Correia was dependent upon him for support or maintenance. In fact, the evidence is all to the contrary."

The word "dependent" is really broader in scope than actual dependency. In construing the word under the Federal Employers' Liability Act the courts have held that grammatically speaking the word "dependent" refers only to the next of kin (*Berg* v. *Atlantic Coast Line R. Co.*, 108 S.C. 63 [93 S.E. 390]). A right of recovery is not dependent upon actual necessitous want, but is based on "pecuniary loss" sustained or which will be sustained by the beneficiaries. It has been held that a person is "dependent" upon another when he has the moral right to rely and does rely upon such other person for support, whether in whole or in part (*Pittsburgh, C. C. & St. L. R. Co.* v. *Collard's Administrator*, 170 Ky. 329 [185 S.W. 1108, L.R.A. 1918E 273]; *Gulf, C. & S. F. R. Co.* v. *McGinnis*, 228 U.S. 173, 176 [33 S.Ct. 426, 57 L.Ed. 785, 786]; *Wells-Dickey Trust Co.* v. *Chicago B. & Q. R. Co.*, 166 Minn. 79 [207 N.W. 186], reversed on other grounds in 275 U.S. 161 [48 S.Ct. 73, 72 L.Ed. 216]; *Murphy* v. *Nowak*,

223 Ill. 301, 307 [79 N.E. 112, 7 L.R.A.N.S. 393]). It has been held that all that is required is a reasonable expectation of pecuniary benefit from the continuance of the life of the child (*Moffett* v. *Baltimore & O. R. Co.*, 220 F. 39, 43 [135 C.C.A. 607]; *Tobin* v. *Bruce*, 39 S.D. 64 [162 N.W. 933], cert. denied, 245 U.S. 18 [38 S.Ct. 7, 62 L.Ed. 123]).

 In the case at bar there was evidence that Joseph Correia was 18 years of age when he met his death; that his earnings were in excess of $6,000 per year; that he was kindly disposed towards his mother and father. There was also evidence that he voluntarily turned over to his parents virtually all of his earnings. That there was a joint life expectancy between the three (mother, father and son) of 17 years; and between the mother and son of 25 years. And, had decedent lived, the ensuing three years would be years of minority during which the parents would have had a claim upon the earnings of the son.

Whatever the parents were earning at the time of the demise of their son, there was evidence warranting the assumption that they could not expect to continue earning wages indefinitely. It was shown that the father was suffering from varicose veins and was assigned to the easiest of jobs aboard ship and that the mother by reason of her physical condition, was compelled to engage only in work which did not require her to stand.

Since the various factors involved in damage cases of this kind are not capable of exact proof in terms of dollars and cents, the only standard is such an amount as a reasonable person would estimate as fair compensation for pecuniary loss. As was said in *Roedder* v. *Rowley*, 28 Cal.2d 820, 822 [172 P.2d 353], "Hence, necessarily, the determination of the amount of damages is, in the first instance, left to the exercise of a sound discretion by the jury, and a verdict will not be disturbed by an appellate court unless it is so grossly disproportionate to any reasonable limit of compensation as shown by the evidence that it shocks one's sense of justice and raises a presumption that it is based on passion and prejudice rather than sober judgment." (Citing cases.)

Another persuasive argument is that the trial judge, clothed with power to "consider the evidence anew, determine anew the facts, and set aside the verdict if it is not just" (see *Hale* v. *San Bernardino etc. Co.*, 156 Cal. 713, 715 [106 P. 83]), refused to grant a new trial. His action in this regard must be taken to indicate that he did not consider the verdict

excessive. In determining whether a verdict was based upon passion or prejudice the conclusion of the trial judge is persuasive.

In the last decade or more, radical changes have taken place in social conditions, and particularly in conditions affecting the costs of living. Courts have recognized this fact as well as noticing the difference in the purchasing power of money.

In the case of *Foster* v. *Pestana*, 77 Cal.App.2d 885, 889, 890, 891 [177 P.2d 54], Mr. Justice Goodell, speaking for the court, in a well considered opinion, reviews the law applicable to a consideration on appeal, of the claim that a verdict is excessive. By reason of the facts and circumstances proved in the case now engaging our attention and upon the authority of the case just cited we are constrained to hold, as did the court in *Roedder* v. *Rowley, supra,* on this subject, ''The question of what may be reasonable compensation in cases of this kind is a matter on which there legitimately may be a wide difference of opinion (*Bellman* v. *San Francisco H. S. Dist.,* 11 Cal.2d 576, 586 [81 P.2d 894]), and we cannot say that the amount awarded by the jury in this case is so large as to indicate that it was the result of passion or prejudice.''

It is next contended by appellants that the trial court erred in permitting respondent to introduce evidence of the standard of care which would have been exercised by an expert diver.

This point involves certain testimony given by respondent's witness Garland Suggs, admittedly an expert on the subject of diving, having been in the United States Navy for 22 years where he was engaged in diving supervision and as an instructor in diving. This witness was asked a hypothetical question containing facts admittedly present at the time and upon the occasion here in question. The interrogatory elicited the answer that an emergency or extra line other than the air line was necessary for the safety of the diver. At the trial the question was objected to by appellants on the ground that it invaded the province of the jury. The same contention is made here. Conceding, as appellants contend, that their liability was to be determined under the general rule which defines negligence as the lack of due care under the circumstances present; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done, we fail to

see wherein the province of the jury was invaded by the challenged question. The testimony of the expert witness did not establish the standard of an expert. It simply set forth what is considered a fundamental element of safety in diving under conditions as to depth and otherwise which prevailed when the deceased was diving. These fundamental elements of safety should be known to the master of the ship, and if he authorizes a dive in disregard of them he and his employers must accept the responsibility. Ship owners and their agents and officers may not set up their own standards of care. It cannot therefore, be said that the operation of shallow water diving at sea, using special equipment therefor, is not the subject of expert opinion. This is not an operation within the scope of common experience. Appellants apparently concede this because they make no objections to other questions asked of and answers given thereto by the expert witness.

Furthermore the jury was properly instructed regarding any expert standards when they were admonished as follows: "You are instructed that in furnishing equipment the defendants were not required to furnish any particular item of equipment unless ordinarily careful employers of seamen fishermen would have done so. The defendants were not required to furnish any item of equipment which an expert diver would consider necessary, unless the plaintiff has proved by a preponderance of evidence that ordinarily careful employers of seamen fishermen would have furnished such equipment. In other words, the legal standard of care required of the defendants is not what an expert person, highly skilled and possessed of extraordinary knowledge and extraordinary skill would have furnished, but what the general average of ordinarily careful employers of seamen fishermen would have furnished under the circumstances existing on December 26, 1949." The objection to the question was properly overruled.

Finally, appellants urge that the court committed prejudicial error in giving certain instructions at the request of respondent and in refusing to give certain instructions proffered by them.

 The first complaint covers the giving of the following instructions:

"You are instructed that the law imposes a duty upon a vessel owner or owners to use reasonable and ordinary care

to furnish to seamen a reasonably safe vessel, and that for such a vessel to be reasonably safe it must be manned by a master and crew generally competent for the purposes for which the owners intend such ship and her equipment to be used, and if you find, from all of the evidence, that the vessel, SEAHOUND, was, through the negligence of the defendants, not manned by a master and crew generally competent and that said negligence was a proximate cause of the death of the decedent, then you must find for the plaintiff."

Appellants insist that the instruction is erroneous insofar as it refers to the duty of the owners of the vessel to furnish a master and crew "generally competent." In view of what we have heretofore said, with supporting citations, as to the differing conditions at sea from those prevailing on land, there is a duty upon the owner to provide a master and crew generally competent *("The Rolph,"* supra, p. 54), the instruction was proper. The very nature of a seaman's occupation and his confinement aboard ship creates in the employer a higher degree of care than exists ashore. At sea the seaman is at the mercy of his employer concerning equipment, living conditions, and the competency of fellow crewmen, especialy of the ship's officers under whose direction and supervision the seaman must work. The jury was therefore, properly instructed that it was for them to determine from the evidence whether through the negligence of appellants, the vessel in question was not manned by a master and crew generally competent, and whether such negligence, if found by the jury, was a proximate cause of the death of decedent.

Appellants' contention that the instruction was erroneous because being a formula instruction, it omitted an admonition that the burden of proof rested upon respondent to show that she and her husband were and would be actually dependent upon the deceased for support; that he would, with reasonable certainty, have continued to support them; and that the parents thereby actually sustained a pecuniary loss as the proximate result of the death of Joseph Correia, is answered by the statement that the jury was otherwise fully and fairly instructed upon the claimed omitted elements. Hence there was no resultant prejudice from the giving of the challenged instruction.

What we have just said is equally applicable to the other so-called "directed verdict" instructions complained of by appellants.

■ Appellants' next complaint is directed to the following instruction:

"You are instructed that if you find from all the evidence presented to you, that shallow water diving was an act within the scope of the employment of Joseph Edward Correia as a fisherman seaman, you need not consider in determining negligence whether anyone ordered, or commanded, or requested him to perform said job."

A reading of appellants' objection to the foregoing instruction would indicate that they contend that it took from the jury the right to determine whether Correia was a volunteer and thereby assumed the risk of the dive he made. Assumption of risk as a defense under the Jones Act, whether in whole or in part, has been abolished by statute and is therefore not available (U.S. Code, title 45, § 54). It is conceded that the task Correia was performing was one ordinarily encountered in the service of the ship. The instruction did not invade the province of the jury. In simple and understandable language it informed the jury that if they found from the evidence that shallow water diving was an act within the scope of Correia's employment it mattered not whether he was specifically ordered to perform the task. We find no error in the giving of such an instruction.

■ Appellants next complain of two instructions given with reference to negligence on the part of decedent. It is urged that the instructions are conflicting and are prejudicial to appellants for the reason that they require the latter to overcome an unwarranted burden under the second instruction if the first so-called conflicting instruction was followed by the jury.

The first of the challenged instructions correctly informed the jury in effect that a minor may be expected to exercise that degree of care which a person of his age, intelligence, capacity, discretion and experience would naturally and ordinarily use (*Finnegan* v. *Giffen*, 89 Cal.App. 702, 709, 710 [265 P. 496]). This instruction was followed by the admonition that under the law, "it is presumed, until the contrary appears from the evidence, that Joseph Correia at the time and place in question, was exercising ordinary care and acting as a reasonably prudent person would act. This presumption is itself evidence in this case, to which plaintiff is entitled unless rebutted by other evidence." We fail to see wherein the jury could have been misled or confused by the foregoing instruction. The only reasonable construction

that could have been placed on the last instruction (following as it did the first instruction and specifically naming Correia) was that the decedent Correia was presumed to have been exercising the degree of care upon which the jury had, immediately prior thereto, been instructed, namely, that required of a minor.

In the light of what we have hereinbefore stated we find no prejudice to appellants in the instructions given with regard to the earnings of an unmarried minor child. That the decedent was a single man was the theory upon which the case was tried and the evidence showed that by reason of his unmarried status he was contributing the major portion of his earnings to his parents. Appellants' objections to the instruction on the life expectancy of the parties concerned, on the ground that the jury had no right to consider life expectancies unless respondent had proved there was a reasonable certainty of damage, cannot be sustained. The evidence established that decedent contributed practically all of his earnings to his parents. From all of this evidence the jury had before them sufficient facts to determine that in the death of their son the parents had suffered a pecuniary loss. The jury was advised that they were not bound by tables of life expectancy, but could consider other evidence in that regard.

It would unduly prolong this opinion to here set forth appellants' claimed error in the refusal of the court to give certain instructions proffered by them. These requested instructions concerned the necessity for respondent, in order to establish actionable negligence, to prove by a preponderance of substantial evidence that at the time the pump supplying air to Joseph Correia was stopped he was not only conscious and alive but was actually in the helmet, and that the pumping was stopped for a sufficient length of time to proximately cause or proximately contribute to the death of Correia. The court modified the requested instruction but as given, it clearly informed the jury that respondent was required to prove "that during the time the pumping was stopped, Joseph E. Correia was not only alive but that the pumping was stopped for a sufficient length of time to proximately cause or proximately contribute to the death of Joseph E. Correia."

Remembering that instructions must not be considered singly but in their entirety, we are convinced that the trial

judge fully and fairly advised the jury as to the kind, quality and degree of proof necessary before respondent could recover. That is all that was required.

For the foregoing reasons the judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied October 8, 1952, and appellants' petition for a hearing by the Supreme Court was denied November 10, 1952.